## BEECHER *v.* ALABAMA

No. 71–6497.   Decided June 26, 1972

PER CURIAM.

In 1964 the petitioner was tried and convicted in an Alabama state court for first-degree murder. He was sentenced to death. The conviction was based in large part on written confessions that he had signed five days after his arrest. The petitioner objected to the introduction at trial of these confessions. But the trial court and the Alabama Supreme Court held that the confessions were made voluntarily and were properly received into evidence.

In 1967 this Court summarily reversed that judgment of the Alabama Supreme Court. *Beecher* v. *Alabama,* 389 U. S. 35. We said:

"The uncontradicted facts of record are these. Tennessee police officers saw the petitioner as he fled into an open field and fired a bullet into his right leg. He fell, and the local Chief of Police pressed a loaded gun to his face while another of-

ficer pointed a rifle against the side of his head. The Police Chief asked him whether he had raped and killed a white woman. When he said that he had not, the Chief called him a liar and said, 'If you don't tell the truth I am going to kill you.' The other officer then fired his rifle next to the petitioner's ear, and the petitioner immediately confessed. Later the same day he received an injection to ease the pain in his leg. He signed something the Chief of Police described as 'extradition papers' after the officers told him that 'it would be best . . . to sign the papers before the gang of people came there and killed' him. He was then taken by ambulance from Tennessee to Kilby Prison in Montgomery, Alabama. By June 22, the petitioner's right leg, which was later amputated, had become so swollen and his wound so painful that he required an injection of morphine every four hours. Less than an hour after one of these injections, two Alabama investigators visited him in the prison hospital. The medical assistant in charge told the petitioner to 'cooperate' and, in the petitioner's presence, he asked the investigators to inform him if the petitioner did not 'tell them what they wanted to know.' The medical assistant then left the petitioner alone with the State's investigators. In the course of a 90-minute 'conversation,' the investigators prepared two detailed statements similar to the confession the petitioner had given five days earlier at gunpoint in Tennessee. Still in a 'kind of slumber' from his last morphine injection, feverish, and in intense pain, the petitioner signed the written confessions thus prepared for him." *Id.,* at 36–37.

We were led to "the inescapable conclusion that the petitioner's confessions were involuntary." *Id.,* at 38.

For "[t]he petitioner, already wounded by the police, was ordered at gunpoint to speak his guilt or be killed. From that time until he was directed five days later to tell Alabama investigators 'what they wanted to know,' there was 'no break in the stream of events,' *Clewis* v. *Texas,* 386 U. S. 707, 710. For he was then still in pain, under the influence of drugs, and at the complete mercy of the prison hospital authorities." *Ibid.* Because the confessions "were the product of gross coercion," we held that their use at the petitioner's trial violated the Due Process Clause of the Fourteenth Amendment. *Ibid.*

Only three months after this Court's decision, the petitioner was reindicted and retried for the same crime. Again, a confession was introduced in evidence. Again, it was a confession made by the petitioner shortly after he had been shot and arrested and shortly after he had been given a large dose of morphine. Again, the petitioner was convicted and sentenced to death.

The confession used at the second trial was not exactly the same as the ones that had been used against the petitioner at his first trial. It was not one of the written confessions made by the petitioner in an Alabama hospital five days after his arrest. Instead, it was an oral confession that the petitioner had made in a Tennessee hospital only one hour after his arrest.

One hour after the arrest, in extreme pain from the gunshot that had blown most of the bone out of one leg, the petitioner was brought by police to a Tennessee hospital. There, a doctor gave him two large injections of morphine. The petitioner testified that the morphine "kinda made me feel like I wanted to love somebody; took the pain away; made me feel relaxed." From then on, the petitioner said, he could remember nothing. But the doctor testified at trial that he had asked the petitioner "why he did it [the crime]." Ac-

cording to the doctor, the petitioner then made an oral confession. Although police were in the area guarding the petitioner, the confession was made only to the doctor.

The Alabama Supreme Court held that this oral confession was made voluntarily and was admissible in evidence against the petitioner.. *Beecher* v. *State,* 288 Ala. 1, 256 So. 2d 154. We do not agree. We held five years ago that the confession elicited from the petitioner at the scene of his arrest was plainly involuntary.* We also held that his written confessions five days later, while in custody and under the influence of morphine, were part of the "stream of events" beginning with the arrest and were infected with "gross coercion." 389 U. S., at 38. The oral confession, made only an hour after the arrest and upon which the State now relies, was surely a part of the same "stream of events."

We hold now—as we held before—that a "realistic appraisal of the circumstances of *this* case compels the conclusion that this petitioner's [confession was] the product of gross coercion. Under the Due Process Clause of the Fourteenth Amendment, no conviction tainted by a confession so obtained can stand." *Ibid.*

Accordingly, the motion for leave to proceed in *forma pauperis* and the petition for certiorari are granted. The judgment is

*Reversed.*

---

*Although at the second trial the Chief of Police who arrested the petitioner denied having made an explicit threat to kill him if he did not confess at that time, the fact that the petitioner was surrounded by a very angry mob and that police were holding guns on him and even fired one shot by his head is enough to support our original conclusion as to the grossly coercive nature of the police questioning at the scene of the arrest.