360 A.2d 862.

## State *vs.* Louis A. Camerlin.

JULY 29, 1976.

PRESENT: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris, JJ.

JOSLIN, J. The defendant was tried and convicted before a jury in the Superior Court on an indictment charging that while confined in the maximum custodial unit of the Adult Correctional Institutions he did on January 19, 1973, assault Joseph C. Thurber, Jr., a correctional officer at those institutions, in violation of G. L. 1956 (1969 Reenactment) §11-25-2. He appealed and assigns as errors certain evidentiary and other rulings.

There are conflicting versions of the alleged offense. The defendant testified that in response to his complaint of a headache and a request for medication, he was taken to the prison hospital at about 2:00 a.m. by Officer Thurber and Lieutenant Louis Gallucci where almost immediately he became engaged in a verbal altercation with the nurse then on duty, Paul Favino. According to defendant, he was complaining to Lieutenant Gallucci about the treatment he was receiving when Officer Thurber, without provocation, struck him in the face with a ring of keys, causing severe injuries to his nose, mouth, and face as well as heavy bleeding; Lieutenant Gallucci grabbed him around the neck; he was punched and began to choke; and he became unconscious. He was taken to a cell near

the hospital area where he was confined until sometime between 8:00 and 9:00 a.m. when he was attended by another nurse and the prison doctor, and sometime thereafter by the prison dentist. The defendant's story of the affray was largely corroborated by two other inmates who were in the prison hospital when the events described occurred, and who further indicated that defendant was bleeding heavily as the result of being struck.

Officer Thurber, Lieutenant Gallucci, nurse Favino and Norman Galenski, another correctional officer present at the scene, while substantially in agreement among themselves, differed sharply with defendant about what happened after his arrival at the hospital. According to them, Officer Thurber placed himself between defendant and nurse Favino to prevent trouble whereupon defendant initiated the incident by striking Officer Thurber in the shoulder, biting him in the hand, and butting him in the chest. They maintained that defendant swung first; that he was not beaten with a set of keys; that whatever injuries he sustained were attributable to Officer Thurber's swinging his hand upward in an effort to dislodge it from defendant's teeth; and that there was little or no blood on defendant's face immediately after the incident.

At trial defendant realized that credibility would play an important role in the jury's resolution of the evidentiary conflicts. He was also undoubtedly aware that the value of the corroborative testimony of his fellow inmates might have been substantially diminished by damaging cross-examination, and that on the crucial issue of who started the altercation, it was essentially his word against those of the four prosecution witnesses. In that scenario, he now argues, his only hope was to attack the credibility of the prosecution witnesses by discrediting their testimony that his injuries were minor and that he was bleeding only slightly, and thereby to convince the

jury that because those witnesses were untruthful about the extent of his injuries, they were also untruthful in their testimony that he had assaulted Officer Thurber.

To accomplish this purpose he called as witnesses a consultant to a community program, an attorney, a correctional officer, a nurse, the prison dentist and others. When they were not permitted to testify, he made an offer of proof that their collective testimony would have been that when they saw him approximately 6 to 8 hours after the affray, there was a great deal of blood on his face and shirt; that there was a pool of blood on the floor of his cell; that his face was swollen, lacerated and required stitches in several places; and that one of his teeth was broken and another one required recapping.[1] The trial justice rejected the proposed testimony as being in her judgment irrelevant and of minimal probative value on the critical question of whether defendant had committed an assault, and for substantially the same reason refused to admit as exhibits photographs taken shortly after he was removed from the cell where he had been confined following the altercation. These photographs depicted a defendant so bloodied and battered that in the trial justice's judgment they created a potential for prejudicing the jury that overrode whatever relevancy they might have.

It is, of course, the rule that questions of the relevancy of testimony and of photographs are addressed to a trial justice's sound discretion. *State* v. *Verdone,* 114 R. I. 613, 617, 337 A.2d 804, 808 (1975); *State* v. *Rezendes,* 111 R. I. 169, 172, 300 A.2d 472, 474 (1973); *State* v. *Pombo,* 110 R. I. 133, 136, 290 A.2d 855, 856 (1972) (photographs);

---

[1]The defendant made specific offers of proof with respect to most of the proposed testimony. The nature of the remainder of the evidence was manifest from the questions to which the state successfully objected and, hence, may also be considered on review. *See Cambra* v. *Cambra,* 114 R. I. 553, 558, 336 A.2d 842, 845 (1975).

*State* v. *Amado,* 109 R. I. 53, 57, 280 A.2d 324, 326 (1971); *State* v. *Glass,* 107 R. I. 86, 91, 265 A.2d 324, 327 (1970). Notwithstanding, it seems to us that the trial justice did not fully appreciate that both the testimonial and the real evidence offered were intended not to disprove the assault per se, but to discredit the state's witnesses by establishing that defendant, while confined in a cell for 6 or 7 hours had, without explanation from his jailers, been somehow transformed from an individual with a slight nosebleed to a person who was bloody, whose face was so severely lacerated as to require sutures in several places, and who had one broken tooth and another requiring recapping.

This evidence, while not contradictory of the prosecution's testimony about the altercation, surely would have provided a starting point for a closing argument by defense counsel that the state's witnesses, whose testimony had minimized defendant's injuries to a point where it was reasonable to believe that it lacked credibility, could also have fashioned out of something less than whole cloth their testimony of what occurred in the altercation between defendant and Officer Thurber. Certainly, evidence intended for this purpose was not so purely collateral as to make it inadmissible as a contradiction of a merely immaterial issue. *State* v. *Verdone, supra* at 617, 337 A.2d at 807-08; *Kitchen* v. *Barrett,* 58 R. I. 388, 391, 192 A. 809, 812 (1937). Neither was the 6 or 7 hour lag between the alleged assault and the time defendant was seen by the proposed witnesses and the photographs taken so extensive as to deprive the evidence of its impeaching value, although its persuasiveness and weight might thereby be somewhat lessened. Moreover, the photographs, since they tended to disprove the state's testimony about defendant's physical condition, could qualify for admission even though they might have some adverse effects upon the jury. *State* v. *Kieon,* 93 R. I. 290, 295, 175 A.2d 284, 287 (1961).

On balance, therefore, it seems to us that the photographs, in any event, and the testimonial evidence, at least to the point where excludable because cumulative, should have been admitted.

The state argues, however, that the exclusion of this evidence, even if erroneous, was harmless for the reason that it cannot reasonably be said that, if admitted, it would have altered the result of the case. *See State* v. *Izzi,* 115 R. I. 487, 490, 348 A.2d 371, 373 (1975); *State* v. *Bowden,* 113 R. I. 649, 662, 324 A.2d 631, 639 (1974), *cert. denied,* 419 U. S. 1109, 95 S.Ct. 782, 42 L.Ed.2d 805 (1975); *State* v. *Almeida,* 111 R. I. 566, 570, 304 A.2d 895, 898 (1973); *Halpert* v. *Rosenthal,* 107 R. I. 406, 421, 267 A.2d 730, 738 (1970). This is so, the state asserts, because the substance of the excluded evidence had otherwise been brought to the jury's attention. Thus, nurse Favino, one of the witnesses whom defendant was attempting to impeach, although testifying on direct examination that immediately after the alleged assault defendant looked "[l]ike the man with a bloody nose," and that the only blood he observed was "on the upper part of [defendant's] mouth," and not "across the bridge of his nose," also testified on cross-examination that about 6 hours later defendant "had blood over most of his face and his T-shirt" and that several parts of defendant's face probably were stitched. To like effect was the prison doctor's testimony that there was a "* * * good size laceration on the bridge of [defendant's] nose extending down to the point of the nose which measured approximately an inch and a half to an inch and three quarters in length * * *," that there was another laceration over defendant's right eyebrow and one over his lower lip, and that the nose injury probably required eight to ten sutures.

The state argues, in effect, that there is no valid reason for believing that the jurors, presumably unpersuaded

by this evidence, would have been likely to respond otherwise had there been more evidence of substantially the same tenor. Of course, there is no hard and fast test for determining when and how excluded evidence will affect jurors. At best, in deciding that kind of question we exercise a considered and educated judgment, and, at worst, we venture into unfenced fields of speculation. Here, it seems to us that to postulate that the excluded evidence, particularly the photographs, would not have influenced the jury to reach a contrary verdict is to ignore reality and we therefore conclude that the trial justice committed reversible error.

While the conclusions already reached are dispositive, other contentions urged by defendant will arise at the new trial which will be necessary and hence those contentions merit consideration. They include the assertions that the trial justice erred in denying defendant's motion for a judgment of acquittal and in certain of her instructions to the jury. The premise underlying both claims is the same, that is, that the trial justice erroneously construed G. L. 1956 (1969 Reenactment) §11-25-2, the statute under which defendant was prosecuted. That section reads as follows:

> "Assault or escape by maximum custodial unit inmate. — Every prisoner confined in the maximum custodial unit of the adult correctional institutions or in the custody of the warden or other officer while outside the confines of the institutions, who shall assault the warden, or other officer of said institution, or shall escape, or attempt to effect an escape, shall be sentenced by the court to a term of imprisonment in the adult correctional institutions for not less than one (1) year nor more than twenty (20) years, except where the original sentence was imprisonment

for life, said term to commence from the expiration of the original term of such prisoner.[2]

The trial justice assumed, both in passing on the motion for a judgment of acquittal, and in her instructions to the jury, that the word "assault" in §11-25-2 should be accorded its ordinary meaning. Thus, she instructed the jury that "* * * an assault is defined as any unlawful attempt or offer with force or violence to do a corporal hurt to another." The defendant argues that because of the severe penalty prescribed by §11-25-2[3], the word "assault," as used therein should be confined to "* * * assaults connected to an escape or to assaults whose context is such to render them threats to penal discipline on the order of magnitude presented by an escape or an attempted escape." In support he relies heavily on §11-5-8, despite its not having been enacted until subsequent to the incident forming the basis for this prosecution and, therefore, concededly of no direct application here. That section provides:

> "Assault on correctional officers. — Any person who shall knowingly and wilfully strike a uniformed member of the correctional officer staff at the adult correctional institutions causing bodily injury, or wilfully strikes any such member who is out of uniform, knowing said person to be such a member, while the member is engaged in the performance of his duty shall be imprisoned not exceeding three (3) years or fined not exceeding fifteen hundred dollars ($1,500), or both."

---

[2]Prior to trial the parties stipulated that on the date in question defendant was a prisoner confined at the maximum custodial unit of the Adult Correctional Institutions and the alleged victim was a correctional officer.

[3]In contrast, G. L. 1956 (1969 Reenactment) §11-5-3 provides that a person convicted of an assault or battery or both "* * * shall be imprisoned not exceeding one (1) year or fined not exceeding five hundred dollars ($500), or both."

The defendant contends, in substance, that the lesser penalty established by §11-5-8 is evidence that when the Legislature passed §11-25-2, it intended the substantial penalties authorized therein to be imposed only in those cases involving a threat to prison discipline or security. To construe §11-25-2 otherwise, as the trial justice did, would be, defendant continues, to countenance a substantial overlap between that section and §11-5-8, and, consequently, a partial repeal by implication of §11-25-2. That kind of repeal, defendant hastens to remind us, is not favored. Finally, defendant refers to the familiar principle that penal statutes should be narrowly construed.

In our judgment, however, the defendant labors without basis in this contention. The word "assault" has an established and ordinary definition in the criminal law. Nothing in §11-25-2 warrants a departure from that definition, imports ambiguity to the established meaning, or suggests that the Legislature intended that word to receive other than the single and definite meaning it has in the criminal law. Certainly, the severity of the punishment authorized by the provision in which it is found is insufficient reason for according a strained construction to a word whose meaning is otherwise clear. Hence, judicial interpretation is unnecessary, as is any further consideration of the intricacies of the defendant's somewhat complex approach to the construction of this provision. See State v. Capone, 115 R. I. 426, 433-34, 347 A.2d 615, 620 (1975); Andreozzi v. D'Antuono, 113 R. I. 155, 158, 319 A.2d 16, 18 (1974); Podborski v. William H. Haskell Mfg. Co., 109 R. I. 1, 8, 279 A.2d 914, 918 (1971); State v. Ricci, 107 R. I. 582, 588-89, 268 A.2d 692, 696 (1970).

The defendant's appeal is sustained, the judgment appealed from is reversed, and the case is remitted to the Superior Court for further proceedings.

*Julius C. Michaelson,* Atty. Gen., *Judith Romney Wegner,* Spec. Asst. Atty. Gen., *Richard B. Woolley,* Spec. Asst. Atty. Gen., for plaintiff.

*William F. Reilly,* Public Defender, *Benedetto A. Cerilli, Jr.,* Asst. Public Defender, for defendant.