STATE

v.

Richard A. PEMENTAL.

No. 80–239–C.A.

Supreme Court of Rhode Island.

Sept. 10, 1981.

Dennis J. Roberts II, Atty. Gen., Thomas H. Caruolo, Special Asst. Atty. Gen., for plaintiff.

McKinnon & Fortunato, Daniel V. McKinnon, Amy R. Tabor, Pawtucket, for defendant.

## OPINION

WEISBERGER, Justice.

This case comes before us on appeal from a judgment of conviction in the Superior Court of assault with intent to commit the abominable and detestable crime against nature.[1] We affirm. The facts of the case may be briefly stated.

The defendant was arrested as a result of a complaint made by Mrs. E. B. who then resided at an address on Hope Street in Bristol. At the trial Mrs. B. testified that on September 8, 1978, she had helped her daughter to move into an apartment located on the floor above in the same building in which her own apartment was situated. A group of professional movers had been retained to carry out the transfer of furniture. Among the three movers on the premises in addition to the owner of the moving company was defendant. During the course of the moving operation, defendant requested and received permission to use Mrs. B.'s telephone in her second-floor apartment.

At about 2 a. m. on September 9, 1978, Mrs. B. was asleep in her bed when she was suddenly awakened by a hand so placed

---

1. In violation of G.L.1956 (1969 Reenactment) § 11–5–1.

over her nose and mouth that she was unable to breathe. Thereafter, her assailant blindfolded her, though not so efficiently that she was unable to see him. Mrs. B. was terrified and obeyed the assailant's commands to assist him in reaching an ejaculation. There was no act of penetration. Mrs. B., by virtue of a very bright street light that shone into her bedroom, was able to see her assailant very clearly, noting his eyes and very distinctive haircut; she recognized him as one of the young men who had been in the moving crew the day before.

Later that day Mrs. B. complained to the Bristol police and ultimately, by a process of elimination, suspicion was focused upon defendant. On a subsequent date the victim selected defendant's photograph from a Bristol High School yearbook. On September 12, 1978, defendant, accompanied by his natural parents and his stepparents, surrendered himself at the Bristol police station. A process of interrogation ensued which resulted in oral and written inculpatory statements that were later suppressed by the trial justice as not meeting the test of voluntariness, although *Miranda* admonitions had been given. However, after making a statement to the Bristol police, defendant asked if he might speak to Mrs. B. As a result of this request, the police brought Mrs. B. from the waiting room and arranged for a meeting between defendant and the victim in the office of Captain Cosmo E. Mancieri. When defendant came into the room, without any questions being asked, he directed the following remarks to Mrs. B.:

> "Why are you, why are you doing this to me? This is going to be, you're going to ruin my life, and you know I wouldn't do that bad thing to you. I saw you sleeping. You were sleeping on your side and I grabbed you, but I didn't do that bad thing. Somebody that was with me did it, and I didn't."

The victim continued to insist that defendant, and he alone, had entered her apartment and assaulted her.

In support of his appeal, defendant raises three issues.

I

## THE STATEMENT MADE TO MRS. B.

The defendant argues that the trial justice erred in admitting into evidence the statement made to Mrs. B. in light of the trial justice's earlier ruling that his statements made to the police were involuntary. In essence, he argues that the statement made to the victim was the product of the illegal conduct of the police in obtaining his confession in the first instance. *Beecher v. Alabama*, 408 U.S. 234, 92 S.Ct. 2282, 33 L.Ed.2d 317 (1972); *Beecher v. Alabama*, 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The trial justice, however, disagreed with this contention and stated: "The confrontation between the defendant and the victim has nothing whatsoever to do with the statement we discussed on the motion to suppress the confession." Thus, the trial justice as a matter of fact found that the statement to Mr. B. was not the product of the earlier statements that defendant had made to the police.

The fruit-of-the-poisonous-tree doctrine has had an interesting history since its genesis in *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), and the first use of this specific phrase in *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307, 312 (1939). Perhaps one of the most precise examples of articulation of the "poisonous tree rule" is found in *Wong Sun v. United States*, 371 U.S. at 487–88, 83 S.Ct. at 417, 9 L.Ed.2d at 455, in which the Court observed:

> "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality

or instead by means sufficiently distinguishable to be purged of the primary taint.'" [Citation omitted.]

In interpreting this language in *Copeland v. United States*, 343 F.2d 287 (D.C.Cir. 1965), then Circuit Judge Warren Burger considered the application of the doctrine to a spontaneous statement made to a robbery victim during the time in which the defendant was allegedly unreasonably detained in violation of *Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). His language is most applicable to the case at bar.

"To exclude the apology under this holding we would be required to find (a) that it would not have been made but for the interrogation and (b) that it was a result—a fruit—of deliberate exploitation by police of interrogation prior to preliminary hearing. We must reject this contention.

"Here not even a 'but for' relationship is shown to exist between the interrogation and the apology. The witness Kuck had been summoned before any interrogation took place and would have arrived at the police station regardless of events occurring during the period of his transit. * * * We can only speculate whether appellant would have apologized to Kuck absent prior interrogation by Evanoff and confession of the crime. Whatever the force to the 'cat-out-of-the-bag' argument in determining a nexus between two successive confessions to police, it would seem to have none as to a spontaneous, unsolicited and unexpected comment addressed only to a victim. An apology to a private citizen is a different breed of 'cat' from the kind involved in a statement to police.

"Even if a 'but for' relationship between the interrogation and the apology is assumed, however, the element of deliberate exploitation required by *Wong Sun* is absent." (Footnote omitted.) *Copeland v. United States*, 343 F.2d at 291.

In the case at bar there is not one shred of evidence to support a theory that the police sought to exploit the prior confession by presenting defendant to Mrs. B. She was not used in any way as a lever by the police. The confrontation was wholly at the initiative of defendant. It is not even contended that the police suggested the confrontation. The evidence in the case would indicate that neither defendant nor the police anticipated that any statement would be made to Mrs. B. All of the inferences to be drawn from defendant's own testimony at the suppression hearing (which did not deal with this statement to Mrs. B. save by oblique reference) were to the effect that defendant hoped for exoneration by a face-to-face meeting with Mrs. B. It would be very difficult to accuse the police, in acceding to defendant's request, of exploiting any prior illegality. *Cf. Commonwealth v. Bordner*, 432 Pa. 405, 418, 247 A.2d 612, 618 (1968) (defendant's admission to parents, who were assisting police, was inadmissible product of prior unlawful interrogation).

The evidence in the case amply supports the finding of the trial justice. The victim had already selected defendant by photograph as her assailant. The defendant hoped by confronting her to cause her to recant her identification at least in part. It appears to be undisputed that the confrontation between defendant and the victim came about as a result of defendant's request and not at the initiation of the police.[2] Consequently, in the light of the deference paid to the finding of a trial justice in respect to a matter of historical fact, we cannot say that the trial justice was clearly wrong. *State v. LaRosa*, 112 R.I. 571, 576, 313 A.2d 375, 377 (1974); *State v. Leavitt*, 103 R.I. 273, 290, 237 A.2d 309, 318–19, *cert. denied*, 393 U.S. 881, 89 S.Ct. 185, 21 L.Ed.2d 155 (1968); *see Culombe v. Connecticut*, 367 U.S. 568, 603, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037, 1058 (1961) (plurality opinion

---

2. *See Edwards v. Arizona*, —— U.S. ——, ——, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 387 (1981) (even accused who invoked right to counsel

may initiate subsequent interrogation, but police may not).

by Frankfurter, J .). The trial justice did not err in admitting the challenged statement.

## II

## THE FAILURE OF THE POLICE TO PRESERVE AND ANALYZE THE BED LINEN FOR SEMINAL FLUID AND PUBIC HAIRS

◼︎ The defendant argues that the Bristol police violated his constitutional right to due process by failing to seize the bed linen of the victim and to have the linen scientifically analyzed for seminal fluid and pubic hairs. He therefore contends that the trial justice should have dismissed count 4 of the information.[3] In support of his argument he cites the leading case of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *Brady*, Mr. Justice Douglas held on behalf of the Court that it was a violation of the defendant's due-process right to a fair trial for the state to suppress evidence in its possession which would have been exculpatory to the accused on the issue of punishment. *Id.* at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218. These principles were further illuminated in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), in which the failure of the state to disclose the victim's criminal record to defense counsel was held in the context of the entire record not to be sufficiently material to constitute a denial of due process.

In the case at bar, no suppression of evidence is alleged. Actually, the police did not seize or analyze the bed linen of the victim. In all likelihood, the police were content to rely upon the eyewitness testimony of the victim as well as the statements of the accused, a portion of which was later suppressed. There is also not the slightest shred of evidence in the case that an analysis of the bed linen would have resulted in any exculpatory evidence. *State v. Faraone*, R.I., 425 A.2d 523, 525 (1981).

Among the cases cited by defendant is *Evans v. Superior Court*, 11 Cal.3d 617, 522 P.2d 681, 114 Cal.Rptr. 121 (1974). In that case the Supreme Court of California required the trial court to conduct a lineup confrontation at the request of the defendant on the ground of fundamental fairness. The defendant cites this case as authority for the proposition that it is the obligation of the state affirmatively to seek out evidence and not merely to refrain from suppressing evidence in its possession. This proposition might have some force if the bed linen had been within the reach of the prosecution at the time the request for exculpatory evidence was made.

We recognize that police departments in this state, as elsewhere, vary in the degree of sophistication with which they investigate evidence by scientific means. Even the most well-equipped and knowledgeable investigators may overlook or fail to pursue every clue or lead upon which scientific evidence might be predicated. We are reluctant to adopt a rule that would overturn a conviction based upon the required quantum of proof beyond a reasonable doubt solely on the basis that defendant might point out some scientific mode of investigation which was not pursued by the police.

As a consequence, the trial justice did not err in his ruling that the failure of the Bristol police to preserve and analyze the bed linen did not violate defendant's right of due process.

◼︎ The defendant also asserts that the trial justice erred in respect to this issue by refusing to allow testimony concerning the standard procedure of the Bristol police in respect to scientific analysis of evidence in rape and sexual-assault cases. It is noteworthy that many of the questions directed to the chief of police related to rape cases as opposed to the type of offense with which defendant was charged in the instant case. An analysis of the record discloses that the trial justice rejected these ques-

3. This is the count that charged defendant with assault with intent to commit the abominable

and detestable crime against nature.

tions and an offer of proof on the ground of relevance. The determination of relevance is within the sound discretion of the trial justice whose determination will be reversed only in the event of an abuse of discretion. *State v. Camerlin*, 116 R.I. 726, 729, 360 A.2d 862, 865 (1976); *State v. Verdone*, 114 R.I. 613, 617, 337 A.2d 804, 808 (1975); *State v. Rezendes*, 111 R.I. 169, 172, 300 A.2d 472, 474 (1973). Here the trial justice determined that the procedures referred to were not relevant to any question of fact to be submitted to the jury. In this case we find no abuse of the trial justice's discretion.

## III

## THE LIMITATION OF FINAL ARGUMENT

■ The defendant's final contention relates to the limitation of his argument by the trial justice to a period of approximately one hour and five minutes. The defendant asserts that his counsel was unaware at the commencement of the argument that he would be limited to one hour; consequently, he claims, counsel was surprised when he was told at the conclusion of fifty-five minutes of argument that he had only five minutes remaining.

It is true that final argument is a vital part of the assistance of counsel guaranteed by the Sixth Amendment to the Constitution of the United States, *Herring v. New York*, 422 U.S. 853, 862, 95 S.Ct. 2550, 2555, 45 L.Ed.2d 593, 600 (1975). However, in *Herring* the Supreme Court clearly rejected the proposition that closing arguments in a criminal case are uncontrolled or unrestrained. The Court specifically recognized that a trial judge may limit counsel to a reasonable time and may terminate argument when continuation thereafter would be either redundant or repetitive. *Id.* at 862, 95 S.Ct. at 2555, 45 L.Ed.2d at 600.

In this state there is no rule of criminal procedure which defines the limit of time for final argument. Rule 51 of the Superior Court Rules of Civil Procedure limits argument for cases commenced in the Superior Court to one hour and for cases commenced in the District Court to forty minutes. Rule 24 of the Supreme Court Rules of Appellate Procedure limits arguments before this court to thirty minutes and to a period not in excess of ten minutes to the moving party for reply.

It has generally been the custom in this state for attorneys who may in exceedingly complex cases need additional time to request such time of the court prior to the commencement of argument. No such request was made in the case at bar.

Moreover, this case was not unduly complex. The evidence was presented over a period of five days and consisted largely of the eyewitness testimony of the victim, brief testimony of police witnesses, and an alibi defense raised by the defendant. Under these circumstances, we are of the opinion that the allowing of one hour and five minutes for argument did not in any way derogate from the defendant's right to assistance of counsel and his right to due process.

For the reasons heretofore stated, the appeal of the defendant is denied and dismissed, the judgment of conviction is affirmed, and the papers in the case may be remanded to the Superior Court.

SHEA, Justice, with whom MURRAY, Justice, joins, concurring in part and dissenting in part.

I concur with Mr. Justice Weisberger in his conclusion that no error was committed on the part of the police when they allegedly failed to preserve and to analyze certain tangible evidence, and that no prejudice inured to the defendant by the trial justice's limitation of the defense counsel's closing argument. However, I must respectfully dissent from his holding that incriminating statements made by the defendant when confronted with the victim at the police station only moments after he

had made a coerced and inadmissible confession to police were not so tainted under the totality of the circumstances as to be inadmissible against him.

Initially, the trial justice was correct in suppressing defendant's oral and written confession. He granted the suppression motion after finding that he could not "honestly find that the confession was freely and voluntarily given * * * under the circumstances of this case."

Later, during the trial, the prosecutor attempted to present the oral statements made by defendant to the victim, Mrs. B., at the police station. The defendant's timely objection asserted that the totality of the circumstances involving the earlier, improperly obtained confession required exclusion of the statements made to Mrs. B. The objection was overruled. An examination of the record reveals that the motion to suppress did not actually address the oral statements, but rather the written confession. However, the oral statements in question were so closely related to the suppressed confession that had resulted from impermissible police conduct that it was error to admit evidence of the oral statement. The trial justice at no time made a finding that the statements in question were voluntarily given. He ruled only that they were separate from the suppressed confession.

Let us examine the circumstances of the case which persuaded the trial justice that the confession was not voluntary, and consequently not admissible. The defendant had entered the police station in the company of his natural parents, who were divorced, and his stepmother and stepfather. The defendant's mother and stepfather, with whom he lived, had been notified the night before that there was a warrant out for their son's arrest. The stepfather, Mr. Marshall, was related to the chief of police, and he and the other parents were also friendly with members of the police department. All four had gone to the police station fully confident that Mr. Marshall had a good relationship with members of the department and that he and the other family members could believe and rely on what was said to them by the police. The trial justice so found in his decision on the motion to suppress. He also found it likely that this supposed good relationship with members of the police department was the reason why neither the parents nor the young defendant asked for an attorney to advise them.

Immediately upon arriving at the police station defendant was placed under arrest, advised of his constitutional rights, and separated from his parents. Then began a period of questioning that lasted two hours or more. The defendant was questioned principally by Detective Frederick Cavallaro but other members of the police department made appearances as well. At first, defendant denied all involvement in the crimes. He was questioned at length, and on more than one occasion he was told in graphic detail by members of the police department what they would do to a person who entered their homes and touched any female occupant. He was also told in brutal detail what happens to sex offenders when they are brought to the prison: how they themselves are made the victim of brutal sexual attacks that leave them disabled for long periods.

The trial justice said in his decision on the motion to suppress that he believed the young defendant gave a credible story. Part of that story was that defendant was told that if he gave a confession to some of the charges, other charges would probably be amended or reduced and that he would probably be given probation. During the interrogation, defendant's parents could hear loud noises and yelling and screaming from the room in which defendant was being questioned. At certain points defendant was described by witnesses as crying and as so upset that he was hardly able to talk. After continually denying his involvement he was placed in a jail cell. Detective Cavallaro said to him at that time, "To hell

with you; you can rot there; you will go to the ACI and never see light again," among other statements which need not be repeated here. At some point during the interrogation, defendant asked for an opportunity to confront the victim stating that he was sure she would not accuse him face to face.

After leaving defendant in the jail cell, Detective Cavallaro spoke with the parents and told them the boy had not admitted to anything, but "we threw him into a cell to scare him." Cavallaro suggested that the father and stepfather speak to the boy—if they could get him to confess, some of the charges would be dropped. The father and stepfather did talk to defendant in the cell as Cavallaro suggested. The stepfather told the boy that if he confessed to the theft of an automobile, which was also one of the alleged crimes, that charge would be dropped; and because of the stepfather's friendship with Cavallaro, he believed the other charges would in fact also be dropped. After this talk with the father and stepfather, Cavallaro came to defendant's cell and said, "[C]ome on, we're going," intimating he would be going to the ACI where he had been told some dreadful things would be done to him by the other prisoners. At this point defendant admitted taking the car and to breaking and entering, but he continued to insist that he had "touched no lady." After admitting being involved in a car theft and breaking and entering, defendant was taken to a desk, where the confession was written out. During this procedure Cavallaro again assured defendant that he would talk to the judge and that the worst defendant would probably get would be probation. He was next photographed and fingerprinted, and then he confronted the victim in one of the offices. Mrs. B. herself described defendant at that point as distraught and crying. At that time he made statements to her asking her why she was accusing him, claiming that his life would be ruined, admitting that he had been in her room, but denying any sexual assault.

I believe it is clear from the record that at the time defendant had the confrontation with the victim, he was laboring under the same emotional and psychological pressures that required his written statement be suppressed. He was led to believe that charges would be dropped or amended, that probation would be recommended to the judge, and that he would receive favorable treatment because of his stepfather's relationship with certain police officers. Further, defendant was led to believe that if he failed to cooperate, he would be sent to prison and himself victimized. These facts convinced the trial justice that the written confession was involuntary, and convince me that the subsequent oral statements were also involuntary. There was no break in the stream of events to separate the suppressed confession from the oral statements. They are almost identical in content, virtually identical in time, and otherwise inseparable from the involuntary confession. The test in determining the voluntariness of the [statements] is whether defendant's statements were "the product of his free and rational choice" and not a product of coercion in any form. *Greenwald v. Wisconsin*, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77, 80 (1968); *State v. Amado*, R.I., 424 A.2d 1057, 1062 (1981). "If a confession is obtained by direct or implied promises or improper influence it will be deemed involuntary." *Id.* at 424 A.2d at 1062 (*citing Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 187, 42 L.Ed. 568, 573 (1897)); *see United States v. Powe*, 591 F.2d 833, 840 (D.C. Cir. 1978).

The trial justice made no finding that the oral statements in issue were voluntarily made. He was never specifically asked to do so. The matter came up on objection of defense counsel. Nevertheless, permitting the jury to hear the evidence has the same result as a finding of voluntariness. When a reviewing court, relying on the entire evidence, is left with the firm conviction that the action below was clearly erroneous, relief should be granted. *United States v. United States Gypsum Co.*, 333 U.S. 364, 68

S.Ct. 525, 92 L.Ed. 746 (1948); *State v. Amado, supra; State v. LaRosa*, 112 R.I. 571, 576, 313 A.2d 375, 377 (1974); *State v. Leavitt*, 103 R.I. 273, 290, 237 A.2d 309, 318, *cert. denied* 393 U.S. 881, 89 S.Ct. 185, 21 L.Ed.2d 155 (1968).

In conclusion, considering the totality of the circumstances, I believe the admission in evidence of the oral statements to Mrs. B. violated the defendant's due-process rights. *See Clewis v. Texas*, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967).

For these reasons I would reverse the conviction and remand the case for a new trial.