STATE

v.

**Michael BOWDEN.**

No. 80–494–C.A.

Supreme Court of Rhode Island.

Jan. 7, 1982.

Dennis J. Roberts II, Atty. Gen., Susan E. McGuirl, Asst. Atty. Gen., for plaintiff.

Thomas W. Kelly, Howe & Dwyer, Kevin F. Dwyer, Newport, for defendant.

### OPINION

KELLEHER, Justice.

The defendant, Michael Bowden (Bowden), was charged with manslaughter in the death of Michael Harris. A September 1979 trial terminated with the jury unable to reach a verdict. A second trial was conducted in January 1980, and the jury returned a verdict of guilty, from which verdict the defendant now appeals.

In August 1977 Bowden, then a dental technician in the United States Navy, resided at the apartment of Yvette Harris, his girl friend, at 78 Mahan Street in Newport.

During this time Bowden apparently developed a close relationship with Mrs. Harris's children, David and Michael, then ages five and twenty months, respectively, who also lived in the apartment. Bowden claims to have been especially fond of young Michael; and according to the child's mother, Michael was responsively affectionate toward Bowden.

In the fall Bowden was stationed in San Diego, California. While on holiday leave, he returned to Rhode Island, staying at the Harris household from Monday, November 28, 1977, through Thursday, December 1, 1977. Throughout that week he looked after the children whenever Mrs. Harris was out of the apartment on errands or at work between the hours of 4 p. m. and midnight.

Late in the afternoon of Thursday, December 1, Bowden, with Michael in his arms, ran frantically into the apartment of Barbara Winters, located next door at 80 Mahan Street. The child was choking on a piece of paper towel which had become lodged deep in his throat. The toddler was placed on the floor while Mrs. Winters, her brother-in-law Wayne Henderson, and Bowden worked on the child for several minutes in an attempt to clear his airway. The paper towel was finally dislodged from his throat, but immediately thereafter the child lapsed into unconsciousness. Bowden administered mouth-to-mouth resuscitation, and Michael was transported to the hospital. He died sixteen days later, never having regained consciousness. The state medical examiner determined that death resulted from cranio-cerebral trauma (injury to the head and brain) produced, in his opinion, in a homicidal manner.

Bowden's appeal centers on two evidentiary rulings by the trial justice relating to the rebuttal evidence introduced by the prosecution. After reviewing the record, we conclude that the rulings to which he objects constitute prejudicial error, and we reverse the conviction. Before discussing the legal merits of his appeal, however, it is necessary to recount briefly the substance of the evidence admitted at trial in both the state and the defense cases-in-chief.

The bulk of the prosecution's case consisted of testimony by five witnesses concerning noises they heard emanating from the Harris apartment during the week of Bowden's visit. These sounds were noted from the vantage point of the apartments adjoining the Harris apartment on either side. At no time did any of these witnesses observe Bowden strike or otherwise abuse Michael Harris. The testimony of the neighbors was that on Tuesday and Wednesday mornings they heard a young child in the Harris apartment crying and the sound of a child's head being banged against a wall of that apartment several times over the course of fifteen to twenty minutes. One of the neighbors also recalled hearing multiple slapping sounds and the sound of a toddler tumbling down the stairs within the Harris apartment. Two of the witnesses reported hearing a man's voice say, "[H]e'd teach him to go to the bathroom in his pants again." On Wednesday evening this same person was overheard telling a child to remain in bed or "his legs would be broken." The witnesses concluded that the crying was that of a child aged eighteen months to two years.

On cross-examination one of the neighbors admitted that the sounds he heard against the wall of the Harris apartment could have been caused by someone punching the wall rather than by a child's body being thrown against it. Another witness, on the other hand, rejected this possibility, steadfastly maintaining that the noise she heard could only have been that of the body of a small child hitting the wall. It was also conceded by one witness that the slaps she heard may have been produced by an open hand against a child's buttocks. In addition, a neighbor testified that in response to the toddler's falling down the stairs on Wednesday, Bowden called out Michael's name in a shocked voice and immediately went to him. She assumed that he consoled Michael because the child's crying ceased. She further stated that she heard no yelling on Tuesday or Wednesday prior to the sound of the child tumbling down the stairs, but she was not certain if Bowden had comforted the child after his fall on Tuesday.

While on the stand, Bowden admitted that he spanked Michael on the buttocks on several occasions during the week in an effort to discipline the child and to further his toilet training. He denied ever having abused either of the Harris children and stated that he had never punched or struck David or Michael. Bowden went on to explain that he frequently wrestled with the boys in play, and as part of this game he would raise his voice, making such statements in jest as, "Get over here," "I'm going to kill you," "Come here," and "Let me break your arm." Bowden also remarked that the toddler was quick to cry or whine whenever he was scolded.

His testimony was supported by the testimony of Mrs. Harris, who had been called as a witness by the state. She related that when the children wrestled with Bowden, they rolled around on the floor yelling and screaming. During these matches, the furniture would be moved about, resulting in loud banging and thumping noises. On the whole she stated, this type of play was accompanied by quite a loud "ruckus," which resounded throughout the apartment. She indicated that sometimes during these matches young Michael would end up crying if he accidentally banged into things.

More generally, Mrs. Harris explained that Michael's method of descending the stairs was to bounce down a step at a time on his rear-end, making thumping noises as he went down. In conflict with the testimony of her neighbors, she claimed that she had been home Tuesday and Wednesday mornings during the time they reported hearing a child thrown against a wall. Mrs. Harris stated that she did not see Bowden strike or abuse the toddler in any way on either of these days or at any other time, nor did she observe any bruises or other injuries on his body. She elaborated that Bowden's method of disciplining both children, to the best of her knowledge, consisted only of spanking them on their buttocks with his open hand when their misbehavior warranted such action.

With regard to the injuries sustained by the child, Bowden asserted that Michael slipped Wednesday evening when climbing out of the bathtub, fell forward, and hit his forehead on the sink that was located only inches from the bathtub. Mrs. Harris substantiated his testimony, relating that upon returning home from work that night she found Bowden asleep in the bedroom with the toddler asleep on his chest. She noticed a red mark over the child's eye, and Bowden informed her about the child's fall in the bathroom. Young Michael awoke, told her that "he had a hurt on his head," and then walked to his own room and climbed into his crib.

Finally, Bowden described the choking incident as the tragic result of a game he had been playing with the toddler. He stated that Michael had been in the kitchen sucking on an ice cube. Some water from the cube dripped onto the floor, and he used a piece of paper towel to wipe it up. To amuse the child, he balled-up the paper towel and tossed it at him. A game of catch ensued. Bowden then put the towel in his mouth and blew it out at the child. In turn, Michael put the paper towel in his mouth and blew it out at Bowden. They then initiated a chase game, and the toddler ran into the living room with the paper in his mouth. Bowden stated that he waited for Michael to come back into the kitchen, and when he did not, he called his name. He received no answer so he went into the living room. He found the child lying on his back on the floor with his mouth gripped tightly closed as if overcome by a seizure. Receiving no response from the child and unable to pry his mouth open to relieve his choking, Bowden took the toddler next door to get assistance.

The external autopsy examination disclosed eight small bruises and abrasions on the head area of the child: two scrapes close together on each cheek, two small abrasions on either side of the head near the ears, and two skin scrapes on the back of the head. Bowden and Mrs. Harris testified that Michael appeared sluggish at breakfast on Thursday. He had a swollen red bruise on his forehead, but they saw no other bruises. Mrs. Winters corroborated their testimony, adding that she also observed a small bruise on one of the toddler's cheeks. Her brother-in-law, Wayne Henderson, testified that he noticed "fist-like bruises" on Michael's head, back, sides, chest, and stomach, but none of the other witnesses observed such marks. Furthermore, no mention of such injuries was made by the medical examiner in either his trial testimony or his autopsy report. We also point out that, notwithstanding his opinion that the forehead bruise was not a significant injury and that the other bruises he noted resulted from separate blows, the medical examiner indicated that the forehead injury "may have played a role in the overall head injuries or cranial cerebral trauma of this child, and may have participated in the development [of a] subdural hematoma." He further agreed that a blow against a porcelain sink would be consistent with and could contribute to the development of the brain hemorrhage.

We turn now to the legal issues raised on appeal. Throughout the trial Bowden was clad in his dress-blues military uniform. After the defense rested, the state presented two character witnesses, both officers from the Newport naval base, for the purpose of impeaching defendant's credibility. The officers testified that Bowden's reputation for truth and veracity among the local naval community was "poor." Over the objection of defense counsel, one of the character witnesses further testified that Bowden was out of uniform because he was not wearing the type of shoes required to be worn with this particular uniform. Naval regulations apparently require dental technicians to wear a low-cut shoe with their dress uniform. Bowden had been wearing military combat boots.

■ Bowden contends that the evidence concerning his attire during trial is irrelevant, and its admission improper and prejudicial. Professor McCormick defines relevant evidence as that which tends to "establish a material proposition," and he elaborates that evidence may be excluded as

irrelevant because the fact at which it is directed "is not provable in the case." *McCormick's Handbook of the Law of Evidence*, § 185 at 435 (2d ed. Cleary 1972). *See also State v. Santos*, R.I., 413 A.2d 58, 69 (1980); 1 Wigmore, *Evidence*, § 9–12 (3d ed. 1940). Generally, the determination of whether certain evidence is relevant lies within the discretion of the trial justice. *State v. Camerlin*, 116 R.I. 726, 729, 360 A.2d 862, 865 (1976); *State v. Verdone*, 114 R.I. 613, 617, 337 A.2d 804, 808 (1975). However, in the instant case, we find that the admission of this evidence constituted an abuse of that discretion.

The state asserts the untenable proposition that the evidence is relevant because a defendant's attire at trial can affect the jury. No doubt jurors are cognizant of the attire of witnesses and other persons appearing in the courtroom. But this trial was conducted two years after the occurrence of the incident for which Bowden was charged. We simply cannot comprehend how the fact that Bowden's shoes were not in conformance with military-uniform regulations can have any meaningful bearing on the question of his guilt or innocence in causing the death of young Michael Harris.

The state also contends that the evidence regarding his shoes was admissible to impeach Bowden's credibility. On cross-examination Bowden had asserted that military-combat boots were part of his uniform. Therefore, the state takes the position that the testimony of the officer was proper because it demonstrated Bowden's untruthfulness on the stand. A review of the transcript discloses that Bowden freely conceded that his boots might not be the appropriate shoes to be worn as part of a dental technician's uniform. In response to the prosecutor's question about whether they conformed to military regulations, he answered, "It varies. You can talk to your captain. Sometimes the commander, depending on who the commander is, they don't allow it. There are some that allow it. All you have to do is get permission from the captain or whatever." He further

explained that he had not obtained such permission. Although Bowden contended that he was not necessarily out of uniform because other personnel wore this type of boot every day, he admitted that he was not sure if, as a dental technician, such permission was in fact required before they could be worn.

Moreover, even if, as the state argues, one were to regard impeachment of this testimony proper in light of Bowden's uncertainty about the need for authorization, the prosecution should not have been allowed to accomplish this through the testimony of an independent witness. A witness may not be impeached on collateral matters by the introduction of extrinsic evidence. The cross-examiner is restricted to the answers of the witness. *Lancaster v. Alden*, 26 R.I. 170, 175–76, 58 A. 638, 640 (1904); *see also Davis v. Freels*, 583 F.2d 337, 342 (7th Cir. 1978); *Kitchen v. Barrett*, 58 R.I. 388, 390, 192 A. 809, 811 (1937); *see generally*, 3A Wigmore, *Evidence*, § 1002 (Chadbourn rev. 1970).

Bowden's other objection relates to the trial justice's refusal to permit the defense to present its own character witnesses, after the state's character witnesses had completed their testimony, to testify to Bowden's good reputation for truth and veracity. With all due deference to the trial justice, we cannot subscribe to his belief that there was no precedent to support Bowden's request to present further evidence. If defendant was ever to be allowed to place such evidence before the jury, this was the only juncture in the trial at which he could permissibly do so.

It is a fundamental principle of law that character evidence bearing on the truthfulness of a witness may not be received in evidence until the witness's credibility has been attacked. *State v. St. Pierre*, 118 R.I. 45, 54, 371 A.2d 1048, 1053 (1977); *Grelle v. Calise*, 111 R.I. 612, 615–16, 306 A.2d 41, 43 (1973). It is equally well recognized that once a witness's credibility has been attacked, whether it is by the introduction of evidence of bad reputation, conviction of crime, inconsistent statements, evidence of

misconduct, or by an incisive cross-examination, the party calling the witness has a right to present evidence designed to rehabilitate the witness's credibility.[1] *State v. Ouimette*, 110 R.I. 747, 760–61, 298 A.2d 124, 133–34 (1972); *see also United States v. Jackson*, 588 F.2d 1046, 1055 (5th Cir.), *cert. denied*, 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979); *Thomas v. State*, 41 Ala.App. 19, 23, 122 So.2d 731, 733 (Ct.App. 1960); *State v. Branch*, 108 Ariz. 351, 353, 498 P.2d 218, 220 (1972); *Boone v. State*, 33 Md.App. 1, 6–8, 363 A.2d 550, 554–55 (Ct. Spec.App.1976); *Redd v. Ingram*, 207 Va. 939, 942–43, 154 S.E.2d 149, 152 (1967); *State v. Eisenberg*, 48 Wis.2d 364, 378, 180 N.W.2d 529, 536 (1970), *cert. denied*, 402 U.S. 987, 91 S.Ct. 1669, 29 L.Ed.2d 153 (1971); *see generally*, 4 Jones, *Evidence*, § 26:25 at 231 (6th ed. 1972); 4 Wigmore, *Evidence*, § 1105 at 235 (Chadbourn rev. 1972).

We deem this court's comments in *State v. Ouimette*, 110 R.I. at 761, 298 A.2d at 133, particularly appropriate in the context of the case at bar:

> "Inasmuch as the function of the jury is to seek the truth, testimony that tends to rehabilitate the veracity of the witness is relevant and material on the issue of credibility and should be admitted." [Citation omitted.]

■ Considering the totality of the evidence before the jury, we conclude that these erroneous rulings were not harmless. Parenthetically, we note that the objection to the exclusion of the defense's character witnesses was adequately preserved at the trial level, and, therefore, the issue of its prejudicial effect is properly before us on appeal. The state's argument that defense counsel failed to make a sufficient offer of proof because he did not specify the names of the witnesses or indicate to the trial

justice the substance of their proposed testimony is without merit. Defense counsel apprised the trial justice that he wished to "introduce evidence of good character and good reputation for truth and veracity in the community." Based on this statement, there could be no confusion about the precise nature of the evidence sought to be admitted or its materiality. Therefore, the defense satisfied its burden of making a suitable offer of proof. *See State v. Almeida*, 111 R.I. 566, 570, 304 A.2d 895, 898 (1973). Furthermore, the state cites no authority, nor are we aware of any, that requires a party to provide more detailed information about such character witnesses in order to preserve an objection to the exclusion of their testimony.

■ In analyzing whether reversible error has been committed, we focus upon similar considerations with respect to either the exclusion or inclusion of objectionable evidence. As for the exclusion of evidence now before us, we must determine whether the rehabilitation evidence, if admitted, could have bolstered Bowden's credibility so that it might have reasonably caused the jury to return a different verdict. *See State v. Camerlin*, 116 R.I. at 731–32, 360 A.2d at 865–66; *State v. Bowden*, 113 R.I. 649, 662, 324 A.2d 631, 639 (1974); *State v. Almeida*, 111 R.I. at 570, 304 A.2d at 898; *Halpert v. Rosenthal*, 107 R.I. 406, 421, 267 A.2d 730, 738 (1970); *Urbani v. Razza*, 103 R.I. 445, 449, 238 A.2d 383, 386 (1968). As for the inclusion of objectionable evidence, such error is harmless, if "it is not reasonably possible that such evidence would influence an average jury on the ultimate issue of guilt or innocence." *State v. Benoit*, R.I., 417 A.2d 895, 901 (1980); *State v. Poulin*, R.I., 415 A.2d 1307, 1311 (1980); *State v. Pugliese*, 117 R.I. 21, 26, 362 A.2d

---

1. Although we recognized in *State v. St. Pierre*, 118 R.I. 45, 55, 371 A.2d 1048, 1053 (1977), that "'a slashing cross-examination may carry strong accusations of misconduct and bad character, which the witness' denial will not remove from the jury's mind,'" in the case at bar we do not believe that Bowden's reputation for truth and veracity was attacked merely by the prosecution's cross-examination of him.

Indeed, the trial justice specified that he was permitting the state to present its character witnesses on the basis of a general proposition, recognized in other jurisdictions, that an accused places his reputation for truth and veracity in issue merely by taking the stand and thus may have his credibility attacked by evidence of a bad reputation in the community.

124, 126–27 (1976); *Grelle v. Calise*, 111 R.I. at 616, 306 A.2d at 44.

In applying these principles, one should not lose sight of the sensitive and highly emotional nature of the instant case. The charge before the jury was the alleged beating death of a two-year-old child. The state's evidence against Bowden was almost entirely circumstantial. Bowden was the only witness presented by the defense. Thus, his credibility in the eyes of the jury was of critical importance to the presentation of his defense. Moreover, he was the only person who could offer any kind of a plausible explanation to rebut the state's circumstantial evidence relating to the hours during which Bowden was alone with the child. Under these circumstances, the jury may well have reached a different result on the ultimate issue of guilt had Bowden been given the opportunity to rehabilitate his credibility in the same manner by which it had been attacked.

With regard to the statement about Bowden's uniform, standing alone such a remark might possibly be discounted as having such slight probative value that its prejudicial effect would be minimal. However, in the context of the overall trial proceedings under review, we do not believe it can be so dismissed. The difficulty of the jury's task in assessing the evidence submitted is manifest by the inability of the first jury to reach a verdict. The state's rebuttal witnesses, including the testimony that Bowden was not in proper uniform, had not been presented at the first trial. Wayne Henderson was the only other witness in the second trial who had not appeared in the first trial.[2]

Henderson testified that a considerable "racket" was coming from the Harris apartment early in the afternoon before Bowden brought Michael to the apartment of Henderson's sister-in-law for aid. He explained that this commotion consisted of banging and thumping noises, the sound of furniture being moved about, slaps as if of "flesh hitting flesh," and the near continuous crying for one and one-half hours of a child approximately two years of age. He also stated that he heard a young child tumble down the stairs and, at some point, Bowden hollering, "Get over here" and "Shut up."

Neither Mrs. Winters nor Henderson's wife was able to support his testimony; they were away from the apartment during the relevant time period. Furthermore, the couple in the apartment on the other side of the Harris apartment, who had testified about noises they had heard on Tuesday and Wednesday, stated that they were home Thursday afternoon and did not hear any such noises coming from the Harris apartment that afternoon. Because Henderson's testimony was uncorroborated and the prejudicial remark relating to Bowden's attire had not been introduced at the first trial, we cannot say that the objectionable statement that he was out of uniform did not play a role in influencing the jury in reaching its verdict.

The defendant's appeal is sustained, the judgment of conviction is vacated, and the case is remanded to the Superior Court for a new trial.

---

**2.** Henderson, who was also in the navy, was stationed overseas at the time of the first trial, but the state was unaware of his precise whereabouts.