Appellant was indicted for capital murder for the intentional killing of two or more persons by the same act or series of acts in violation of § 13A-5-31 (a)(10), Code of Alabama 1975. Appellant entered pleas of not guilty and not guilty by reason of insanity. The jury returned a verdict of guilty and, after a sentencing hearing, appellant's punishment was fixed at life imprisonment without parole.
The State's evidence proved that on April 8, 1981, appellant caused the deaths of Willis Eugene ("Boy") Johnson and Maynard Aaron Overstreet, Jr. by shooting them with a .16 gauge shotgun.
On the afternoon of April 8, appellant's wife drove the family pickup truck to the Fred Clarke residence. Shortly thereafter, appellant was observed driving "pretty fast" in the direction of Fred Clarke's house. Appellant's wife then drove to the home of Mrs. Sophie Johnson, the mother of Boy Johnson, in Alma, Alabama, went inside trembling and shaking, and began to close the curtains and pull down the window shades. Appellant was seen driving past the Johnson house.
Billy Ray Spears, the son-in-law of Mrs. Sophie Johnson, who was present at the Johnson residence, made a call to the sheriff's office. Spears and Boy Johnson then drove the Hopkins pickup truck down the road and parked it in front of appellant's house. Sheriff's Deputy Buster Hough arrived at the Hopkins residence, later followed by Aaron Overstreet.
Appellant walked out into his yard and told the four men assembled in front of his house, "I just poured five gallons of diesel in my house and it's fixing to blow up." Boy Johnson responded, "Why didn't you pour it on yourself and burn yourself up?" Shaking his fists, appellant replied, "I'm going to get you; I'm going to get both of you." The four men left, with Aaron Overstreet, Boy Johnson, and Billy Ray Spears proceeding to the nearby residence of Jimmy Gates.
Spears and others testified that, using binoculars, they observed appellant sitting in his yard shortly after 5:00 P.M., with a rifle. Spears, Johnson, and Overstreet then returned to the Johnson residence.
Jimmy Gates testified that on the afternoon of April 8 he observed appellant driving up and down the road in front of the Gates house and, at one point, appellant stopped near the Gates driveway and then "took off, wide open . . . throwing rocks every which a-way." Gates also saw Deputy Hough talking to appellant and heard appellant say, "Ever who told you I had a high-powered rifle told a damned lie." Gates observed appellant pick up a rifle and put it by his car. Then Gates watched appellant go to a shed, come out with a red can, and walk into his house.
Later, Gates was sitting on his front porch steps when he heard voices which he recognized as those of appellant and Boy *Page 1149 
Johnson. He heard appellant say, "I reckon, God-dammit, you're slipping out here tonight to kill me, ain't you." Gates then walked to the corner of his yard and overheard appellant "tell them to pull something off." Boy Johnson replied, "It's tied, or they're tied; let me bend over where I can untie them." Appellant then was heard to say, "If you bend over I'm going to blow your God-damned belly wide open." Gates heard one shot fired and he went to Mrs. Sophie Johnson's house, where he met Debra Spears, the wife of Billy Ray Spears and sister of Boy Johnson, coming out the door with a shotgun. Gates and Mrs. Spears then took a light and went along the house wall to the north corner where they could hear talking coming from the nearby field. Gates recognized the voice of Aaron Overstreet calling out for Debra Spears and later for his father, Maynard Overstreet.
Deputy James Kidd arrived at the shooting scene at 7:30 P.M., found Maynard Overstreet kneeling by his son, Aaron, and saw Boy Johnson lying nearby. Kidd determined that Johnson was dead. Overstreet was taken to Grove Hill Hospital where he died shortly after his arrival. The deputy observed that neither Overstreet nor Johnson was clothed from the waist up. Next to Overstreet's body Kidd found a loaded pistol in a holster. There was no cartridge in the firing chamber.
Sheriff Roy Sheffield found a loaded .44 caliber pistol, belonging to Boy Johnson, lying between the two bodies in the field. Six spent .16 gauge buckshot shells were found at the scene. Also recovered from the shooting scene, which was in Mrs. Sophie Johnson's garden, 112 feet from appellant's property line, were two blue nylon jackets, and a pair of shoes.
Chief Deputy Jack Day began searching for appellant shortly after his arrival at the scene. Day went to appellant's house where he found a gasoline can in the living room, gas on the rug, and several boxes of .22 rifle ammunition and shotgun shells. Day then drove down the road in front of appellant's house and saw appellant step into the roadway with his hands in the air. The deputy arrested appellant and gave him the Miranda
warnings at 9:15 P.M. He then asked appellant where his gun was and appellant replied that he had left everything in a ditch out in the woods. The following morning, Day found four guns in a ditch near the shooting scene: a Browning .16 gauge shotgun; a Remington .243 caliber semi-automatic rifle; an Iver-Johnson .22 caliber nine-shot revolver; and a .38 caliber revolver, all of which were loaded.
Richard Carter, a firearms and toolmarks examiner with the Alabama Department of Forensic Sciences, testified that he test-fired, in appellant's shotgun, the six expended shotgun shells found at the scene. In his opinion five of them had been subjected to the mechanical action of appellant's shotgun. Carter also examined the shot removed from the bodies of the two decedents and determined that they were number one buckshot. In addition, he identified pieces of felt and plastic shotgun shell waddings removed from the bodies and stated his opinion that the shells had to have been fired at close range in order for the waddings to enter the bodies.
Dr. LeRoy Riddick, forensic pathologist, performed autopsies on the bodies of the two victims. His examination of Boy Johnson revealed buckshot wounds to the right groin area and to the back of the chest. His autopsy of Aaron Overstreet disclosed wounds to the right side of the face and neck, accompanied by powder burns. The angle of entry, in his opinion was "back to front, from right to left, sharply down at about a seventy degree or sixty degree angle." There was also a gunshot wound in the left side of the victim's back, and a graze wound on the wrist surrounded by powder burns.
Appellant testified in his own behalf that on the morning of the shootings he was experiencing back pain related to old World War II battle injuries and he took three prescribed pain-killer tablets. He stated that the physical and emotional after-effects of his war injuries bothered him a good deal and were bothering him on April 8. *Page 1150 
According to appellant, he had a drink with his wife at lunchtime and did not remember anything after that until mid-afternoon when he became upset because he could not find his wife. He testified that he brooded about her not being there and decided that if she did not think enough to stay at home he would burn down the house. He remembered taking a gas can and pouring the contents on the living room rug. He did not recall why he failed to ignite the gasoline.
Appellant admitted ownership of the four firearms introduced into evidence, but stated that he did not remember having them with him on the afternoon of April 8. Appellant next recalled that it was dark, his wife still was not home, and he decided to walk over to the Johnson house to see if she was there.
As he approached the Johnson garden, appellant saw two crouching figures come closer; he ordered them to halt and raise their hands. Appellant said he could not see their faces and could only see their silhouettes against the horizon. He asked them if they had any weapons and one of them said "yes." Appellant then ordered them to get rid of their weapons and to remove their clothing so he could make sure they were not concealing any weapons. He also told them not to bend over out of his sight.
Appellant recounted that he said, "I believe you were coming to my house to kill me," whereupon one figure quickly bent over and a voice said, "Let's get him." Appellant said he heard a shot fired and then he began firing, although he could no longer see the figures outlined against the horizon. He then left the field and walked down the road in front of his house to the spot where he was later arrested.
Appellant admitted that he had never had any trouble with either of the two victims, had no reason to expect a shoot-out that night, had nothing against Overstreet or Johnson, and at the time of the shooting, did not even know who they were.
Dr. Harold Jordan, a Tennessee psychiatrist, called on behalf of the appellant, testified that in his opinion appellant was suffering from a paranoid disorder and was insane on April 8, 1981. He based his opinion on two ninety-minute interviews with appellant, conversations with appellant's wife, and records of the Veterans Administration and Searcy Hospital. He also stated that he had read the transcript of appellant's preliminary hearing. It was the physician's opinion that on the date of the shootings appellant's paranoia caused him to believe that his life was threatened, led him to act on impulse, and made him unable to distinguish between right and wrong.
 I
Appellant argues that the trial court erroneously denied his motion for a change of venue or, in the alternative, for a continuance, based on the following grounds:
 (1) Pre-trial publicity, widespread discussion of the case, and knowledge of the occurrence on the part of the prospective jurors made a fair and impartial trial impossible;
 (2) Many of the prospective jurors knew the decedents or relatives of the decedents;
 (3) Several members of the venire had been represented by the special prosecutor, Wyman O. Gilmore;
 (4) In response to a voir dire question one of the prospective jurors stated, in the presence of the other members of the panel, "I cannot [render a fair and impartial verdict.] I think he should have already been hung."
 (5) Ten deputies were stationed in and around the courtroom during the proceedings, and every person allowed in the courtroom was searched for weapons;
 (6) The jury was intimidated, as evidenced by its request after deliberations had begun "that the jurors, the judge, the attorneys and the defendant meet in the courtroom upstairs for a definition."
It is settled that, on a motion for change of venue, the defendant has the burden to show that an impartial trial and an unbiased verdict cannot reasonably be *Page 1151 
expected in the locality. Patton v. State, 246 Ala. 639,21 So.2d 844 (1945). In our judgment, the trial court was correct in concluding that appellant had not carried the burden here.
The prospective jurors were questioned extensively in six separate panels. Thirty-four of the seventy-seven individuals on the venire stated that they had read one or more newspaper articles relating to the case, but none indicated that he had prejudged the case solely as a result of the newspaper publicity. The eleven prospective jurors who did have a fixed opinion of appellant's guilt were all successfully challenged for cause.
Newspaper articles, without more, do not establish the right to a change of venue, Anderson v. State, 362 So.2d 1296
(Ala.Cr.App. 1978), and in the absence of a "trial atmosphere utterly corrupted by press coverage," Dobbert v. Florida,432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977), there is no presumption of unfairness. The initial articles appeared April 16, 1981, eight days after the alleged crime and eight months before the trial. Voir dire of the jury began on January 25, 1982, and the press coverage immediately prior to that date consisted merely of reports of the procedural status of the case.
Appellant contends that the second set of articles misrepresented facts of the case. The reporting errors, however, were insignificant and harmless to the defense. The first, a statement that the special prosecutor had been appointed by the judge (when, in fact, he had entered an appearance at the request of the victim's families and with the consent of the district attorney) did not, in our judgment, prejudice appellant. The second, a report that the trial judge had denied a defense motion for change of venue (when, at the time, he had simply withheld his ruling until voir dire was completed) was equally harmless to appellant.
In addition, we have reviewed all the other newspaper articles appearing in the record and find them to be objective, non-inflammatory accounts of the alleged crime, without "sensational, accusational or denunciatory" statements directed at the appellant, McLaren v. State, 353 So.2d 24, 31
(Ala.Crim.App.), cert. denied, 353 So.2d 35 (Ala. 1977).
Furthermore, the fact that a case has been the subject of widespread public interest and discussion, and that the prospective jurors have heard details of the incident do not deprive an accused of due process. "Extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair." Dobbert v. Florida, 432 U.S. at 303, 97 S.Ct. at 2303.
 "Extraordinary public interest in the case and supposed public indignation against defendant . . . are conditions which usually attend or follow the commission of all very brutal crimes, whatever the community. . . . In such cases public interest and sometimes public indignation may be intense, but where there are no outward demonstrations indicative or productive thereof upon which to base a just conclusion that a fair and impartial trial would be improbable, no sufficient showing is made to justify the granting of a change of venue." Patton v. State, 246 Ala. at 642, 21 So.2d at 846.
The members of the venire who indicated that their acquaintance with either the victims, the victims' families, or the special prosecutor might dispose them to believe the appellant guilty were excused for cause. Of the remaining jurors who had any relationship with the decedents, their relatives, or the special prosecutor, all stated that they would not allow the relationships to affect their impartiality and they would decide the case on the evidence alone. In Irvinv. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the United States Supreme Court recognized:
 "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his *Page 1152 impression or opinion and render a verdict based on the evidence presented in court." 366 U.S. at 722, 81 S.Ct. at 1642. [Emphasis added] See also Smith v. State, 57 Ala. App. 273, 327 So.2d 766 (1976).
Appellant also claims that the statement, "I think he [appellant] should have already been hung," made by one venireman in the presence of the other panel members was indicative of the "feeling of the prospective jurors" and entitled him to a mistrial. We cannot presume that the comment was indicative of the feeling of any juror other than the speaker, see Gilbert v. State, 401 So.2d 342 (Ala.Cr.App. 1981), and that juror was successfully challenged for cause. Immediately after the remark, the following occurred:
 "MR. KEAHEY: [Defense counsel] Your Honor, we're going to object to the statement in the presence of this panel, and we're going to move for a mistrial.
 "THE COURT: Let me say this: The statement that was made by Juror Robert R. Bedwell is to be disregarded, to be disregarded by the other jurors, and the Court will so instruct you. The other eleven jurors on this panel, I'm going to ask you at this time, is there any one of you that could not disregard that statement made by Mr. Bedwell, if you were selected to serve on this jury?
"NO RESPONSE.
 "THE COURT: All right. The Motion for Mistrial will be denied.
"MR. KEAHEY: We except.
 "THE COURT: Let me see you, Mr. McPhearson [district attorney]. Show an exception to the Court's ruling by the defendant. Let me see you up here.
"COUNSEL APPROACH THE BENCH.
"JUROR MINNIE H. ADAMS: State that again, please.
 "THE COURT: All right. In other words, what I am asking you is can you disregard the statement that was made by the juror and base your opinion and your verdict, if you were selected to serve in this case, solely on the sworn testimony that comes to you from the witness stand and the instructions given to you by the Court? Can you do that?
"A. Yes, sir, I can disregard that; I sure can.
"THE COURT: You may proceed, Mr. McPhearson."
In our judgment, the trial court's prompt inquiry whether the other jurors could disregard the comment and his instructions on the subject were sufficient to remove the effect of the remark. See Richardson v. State, 374 So.2d 433 (Ala.Cr.App. 1979). The trial judge was in the best position to observe the other juror's reactions to the comment and to gauge their ability to disregard it.
In Patton v. State, supra, our Supreme Court determined that the presence of several highway patrolmen in and around the courthouse to aid the local police in maintaining order during a murder trial did not have a "coercive influence on the jury."246 Ala. at 643, 21 So.2d at 846. Instead, the court noted:
 "The presence of the officers . . . `was notice to everybody that the strong arm of the State was there to assure the accused a lawful trial. Any good citizen would interpret this to mean a fair trial in which the guilt or innocence of defendants should be determined on the evidence. . . .'"
Id. (quoting Powell v. State, 224 Ala. 540, 553, 141 So. 201,213 (1932)). Similarly, in Bryant v. State, 49 Ala. App. 359,272 So.2d 286 (1972), cert. denied, 289 Ala. 740,272 So.2d 297, cert. denied, 412 U.S. 922, 93 S.Ct. 2744, 37 L.Ed.2d 149
(1973), the court held that the accused had not been denied a fair trial by elaborate security measures including the registration, photographing and subjection to a metal detector of all persons who entered the courtroom. Accordingly, there was no error in denying appellant's request for a change of venue based on the precautions taken here.
Finally, we cannot presume that the jury's request to have a term defined "in the courtroom upstairs" in the presence of *Page 1153 
necessary parties indicates that the jury felt "intimidated," as appellant suggests. This court is limited to review of matters appearing in the record, Gilbert v. State, supra, and from aught that appears, the trial proceeded without disrupting influences or intimidating circumstances of any kind.
 II
Appellant claims that the State was guilty of prosecutorial misconduct by calling Marie Hopkins, the wife of the appellant, to testify. Appellant informed the trial court that it was his understanding Mrs. Hopkins had previously told the State's investigator that she intended to claim her spousal privilege, under § 12-21-227, Code of Alabama 1975, not to testify. Thus, he contends, the prosecutor's calling Mrs. Hopkins to the stand was merely an attempt to have her invoke her privilege before the jury, thereby giving the jury the impression that her testimony would have been adverse to the appellant.
At trial, the State responded to appellant's objection as follows:
 "If the Court please, we do have a statement from Mrs. Hopkins and we interviewed her in the investigation of this case. . . .
 "We are calling her for the purpose of very important evidence that she has and that she can give, and we expect her to give it. I don't know — We admit that [the investigator] talked to her Monday. We haven't talked to her since then and we don't know what her opinion is at this time, but until she so exercises that privilege we're expecting her to testify as she has already given a statement."
Relying on Wyatt v. State, 35 Ala. App. 147, 46 So.2d 837
(1950), the trial court ruled that Mrs. Hopkins could be called to testify in the presence of the jury. Thereafter, having been informed by the court of her privilege, she chose not to testify.
In Wyatt v. State, supra, the defendant's wife had also previously told the district attorney that she would refuse to testify. At trial, she was called as a witness without objection from the defendant, again made aware of her privilege, and elected not to give evidence against her husband. The court stated the following:
 "In our opinion no error resulted from the fact that the . . . occurrence took place in the presence of the jury. . . .
 "This testimonial exemption [for spouses] is however a privilege, purely personal to the witness, and is solely a matter between the witness and the court.
 "Thus even though Mrs. Wyatt had told the Solicitor she did not wish to testify against her husband, this was but an expression of her then existing intent, in no way binding on her and subject to being changed the next moment.
 "It is to the court that the claim of privilege must be made known.
 "Mrs. Wyatt was called before the court for this purpose. No objection was interposed by the appellant to the procedure followed, nor was any request made that the jury be excused.
 "After Mrs. Wyatt had claimed her privilege the appellant then objected to the questions, and moved for a mistrial. If any merit ever attached to appellant's objection to the procedure followed, which we doubt, clearly his complaint of the court's action was too tardily expressed to be of avail to him." 35 Ala. App. at 154, 46 So.2d at 843 (emphasis in original).
Although the Wyatt court's decision was based, in part, on the defendant's failure to object, we believe the reasoning in the above quoted statements is sound even when, as here, an objection has been interposed. We adopt the rationale of theWyatt court and hold that there was no error in calling Mrs. Hopkins to testify. See generally Annot., 76 A.L.R.2d 920 (1961). See also Busby v. State, 412 So.2d 837 (Ala.Cr.App. 1982), wherein this court found no error in allowing the State to call the defendant's alleged accomplice to the stand, even though the proposed witness had previously indicated his intention to invoke the Fifth Amendment privilege not to testify. *Page 1154 
 III
Appellant contends that the trial court committed reversible error by allowing the Honorable Wyman O. Gilmore to serve as a special prosecutor.
This court has held that a special prosecutor's employment by the victim to represent him in a civil action arising out of the same transaction as the criminal proceeding does not deprive the defendant of a fair trial. Brooks v. State,45 Ala. App. 196, 228 So.2d 24 (1969). See also Hall v. State,411 So.2d 831 (Ala.Cr.App. 1981); Langley v. State, 383 So.2d 873
(Ala. 1980); McCain v. City of Montgomery, 38 Ala. App. 568,92 So.2d 678, cert. denied, 265 Ala. 551, 92 So.2d 682 (1956).
We see no distinction between the special prosecutor's being retained by the victim himself or, in a murder case, by the family of the deceased. In either case, "the fact that the attorney was employed by those interested in the prosecution is wholly immaterial." Brooks v. State, 45 Ala. App. at 201,228 So.2d at 28.
 IV
Appellant was arrested for the instant offense on April 8, 1981. On April 20, he filed a motion for a "judicial determination of his mental competency," alleging that there were reasonable grounds to believe he was presently insane, incompetent to stand trial, and insane at the time of the commission of the offense.
The trial court did not rule on the foregoing motion, but appellant was later sent to Searcy Hospital for a mental examination by order of the Clarke County Probate Court on June 19, 1981. The report from officials at Searcy to Probate Judge Fred Huggins included the following diagnosis of appellant:
 "1) Alcohol abuse, in remission; 2) Personality disorder, emotional immaturity (with dependency and mild acting out features) and 3) Myocardial infarct (1968) and other arteriosclerotic changes along with arthritis changes."
The report concluded:
 "John Hopkins is sane and not in need of inpatient psychiatric treatment at Searcy Hospital at this time. . . . [H]e is mentally competent to stand trial, knows the difference between right and wrong and is able to cooperate and communicate with counsel in his defense."
The letter contained no opinion of appellant's mental condition at the time of the offense with which he was charged.
On December 18, 1981, appellant filed a second motion for sanity determination but presented no evidence in support of his allegations. The trial court denied the motion on January 19, 1982. Then, on January 25, 1982, the first day of trial, appellant refiled his earlier motion and attached three exhibits: the affidavit of one Harold W. Jordan, M.D., a Tennessee psychiatrist; a report by one Michael G. Sumner, M.D., a Mobile, Alabama psychiatrist; and the aforementioned letter to Judge Huggins from the staff of Searcy Hospital.
Dr. Jordan's affidavit, based upon two ninety-minute interviews with the appellant, discussions with appellant's wife and a review of the records of Searcy Hospital, concluded that there were "reasonable grounds to believe [the appellant] was insane at the time of the commission of the offense." The affidavit did not dispute appellant's present sanity or competency to stand trial.
The report of Dr. Sumner, based on a psychiatric examination performed on appellant May 8, 1981, at the Clarke County jail contained the following findings:
"DIAGNOSIS — 1) Alcoholic Deterioration
2) Alcohol Idiosyncratic Intoxication (Black-out)
3) Habitual, Excessive Drinking
 "It is my professional opinion that the patient was impaired, in part, due to brain damage suffered over the many years of his drinking. I believe that justice would be better served by a complete neurological and psychiatric work-up on this man."
Dr. Sumner's report contained no statement regarding appellant's present mental state or competency to stand trial. *Page 1155 
We start with the recognition that there are three Alabama statutes, often confusing and seemingly overlapping, which relate to the mental condition of an accused. See Ala. Code §§15-16-20 through -22 (1975). Section 15-16-20 is directed to "whether [the defendant] should be transferred from jail to a state hospital for treatment" because he is presently insane, and is based upon "a humanitarian consideration which has nothing to do with due process per se." Tillis v. State,292 Ala. 521, 524, 296 So.2d 892, 895 (1974).
Section 15-16-21 provides for a jury determination of a defendant's competency to stand trial. It is constitutionally mandated whenever sufficient doubt exists regarding the ability of the accused to understand the nature and object of the proceedings against him and to assist his counsel in his defense. Pierce v. State, 292 Ala. 745, 293 So.2d 489 (1974);Edgerson v. State, 53 Ala. App. 581, 302 So.2d 556 (1974). See also Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836,15 L.Ed.2d 815 (1966); Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788,4 L.Ed.2d 824 (1960); Seibold v. Daniels, 337 F. Supp. 210
(M.D.Ala. 1972).
Section 15-16-22, which applies only in capital cases, provides a method for determining whether the defendant "was insane either at the time of the commission of the offense or presently." A motion for a mental exam alone under this section has been held not to place the defendant's competency to stand trial in issue. Lokos v. Capps, 625 F.2d 1258 (5th Cir. 1980);Davis v. Alabama, 545 F.2d 460 (5th Cir.), cert. denied,431 U.S. 957, 97 S.Ct. 2682, 53 L.Ed.2d 275 (1977).
Therefore, the three sections appear to relate to three distinct types of mental problems from which an accused may suffer, namely: 1) present insanity; 2) incompetency to stand trial; and 3) insanity at the time of the offense. It has been suggested, however, that "present insanity" is the equivalent of "incompetence to stand trial," Pate v. Robinson,383 U.S. at 384 n. 6, 86 S.Ct. at 841-42 n. 6, and most of the reported cases deal with the constitutional barriers to bringing a defendant to trial when he is unable to comprehend the proceedings or assist in his own defense. See, e.g., Pate v.Robinson, supra; Seibold v. Daniels, supra; Atwell v. State,354 So.2d 30 (Ala.Cr.App. 1977), cert. denied, 354 So.2d 39
(Ala. 1978).
Although appellant's motions for a sanity determination did not specify under which statute he was seeking relief, the allegations of present insanity, incompetence, and insanity at the time of the offense appear to encompass all three sections. Nevertheless, appellant offered no evidence that he was presently insane or incompetent to stand trial. One of his exhibits, the Searcy letter, affirmatively refuted those claims. Under these circumstances, the trial judge did not err in failing to order a jury determination of appellant's present sanity or competence to stand trial. See Gales v. State,338 So.2d 436 (Ala.Cr.App.), cert. denied, 338 So.2d 438 (Ala. 1976).
Appellant did, however, offer evidence that he was insane at the time of the crime charged. Dr. Jordan's affidavit reached that conclusion and neither the Searcy letter nor the report from Dr. Sumner refuted it. The latter two exhibits were simply silent on the issue.
The question facing us, therefore, is whether the trial court was required, by virtue of Dr. Jordan's affidavit and no proof to the contrary, to conduct a pre-trial determination under §15-16-22 on the issue of whether appellant was insane at the time of the offense. We have been cited to no case, and our research has uncovered none, which holds that a presently sane defendant who is fully competent to stand trial, must be given a pre-trial determination of his sanity at the time of the offense in question. Nevertheless, the following language of §15-16-22 appears to mandate a pre-trial resolution of this issue:
 "[When] there is reasonable ground to believe that such defendant was insane either at the commission of such offense or presently, it shall be the duty of the presiding judge to forthwith order that such defendant be delivered . . . to the *Page 1156 
superintendent of the Alabama State hospitals, . . . with the view of determining the mental condition of such defendant and the existence of any mental disease or defect which would affect his present criminal responsibility or his criminal responsibility at the time of the commission of the crime." [Emphasis added]
In an early case construing the predecessor to § 15-16-22, the Court of Appeals determined that the purpose of the statute was to prevent the State from proceeding with the trial of apresently insane defendant. In Benton v. State, 31 Ala. App. 338, 18 So.2d 423 (1944), the court stated the following:
 "Title 15, Section 425, Code 1940, provides the machinery for a preliminary investigation or inquisition of the sanity of one charged with a capital offense before that issue is submitted to a jury in the trial of the cause under a special plea. When it is made known to the court that there is reasonable ground for believing the defendant insane either at the time of the commission of the offense, or presently, this statute operates to suspend the right of the State, pro tempore, to proceed with the prosecution of the offense. An insane person cannot, and ought not, be put to trial. To do so would make a mockery of justice. The instant statute is designed to prevent such result. It is only after the commission of lunacy, made up of the Superintendent of the Alabama Insane Hospitals and two members of his medical staff, has made its written report finding the defendant to be presently sane that the State may proceed with the trial." [Emphasis added] 31 Ala. App. at 343, 18 So.2d at 427.
The reason for the distinction in the statute between "present insanity" and "insanity at the time of the commission of the offense" may also be found in the observation of theBenton court:
 "[I]t is a sound general rule that insanity at any particular time, if shown to be habitual and permanent in its nature, is prima facie presumed as a matter of law to exist at any future time; and alone from its existence at a later time, a presumption of fact may arise of its existence at a given time."
Id. (quoting Odom v. State, 174 Ala. 4, 9, 56 So. 913, 915
(1911)). In our judgment, therefore, § 15-16-22 is based on the presumption, recognized in Benton v. State, supra, that a defendant who was insane at the time he committed the act charged may be presently insane and may not be put to trialwhile he is suffering from that disability.
When, as in the case before us, it affirmatively appears that the defendant is presently sane and competent to stand trial (notwithstanding the fact he may have been insane when he committed the act charged) there is no barrier to proceeding with the trial. In our judgment, the trial court was not in error by failing to order a sanity determination under §15-16-22 when the affidavit of the appellant's own hired expert did not question the appellant's present sanity or competence to stand trial. Dr. Jordan's opinion of appellant's insanity was strictly limited to the time of the offense in question, as shown by his trial testimony:
 "Mr. Hopkins — in my opinion was sane at the time he was evaluated at Searcy [June, 1981]; was sane at the time I evaluated him last week [January, 1982], but was insane at the time the act was committed last April [1981]."
The trial court properly concluded that the issue of appellant's sanity at the time of the shooting was a disputed question of fact best left to the jury to resolve, see Posey v.State, 366 So.2d 369 (Ala.Cr.App. 1979), particularly since the motion was presented to the court on the day of trial, and the jury venire had already been summoned and was present.
 V
Appellant insists that the trial court erred by allowing four prosecution witnesses to testify to statements made by one of the victims, Aaron Overstreet, after he was shot and before he died. The witnesses recounted that after the shooting they heard the voice of Aaron Overstreet *Page 1157 
calling for help. The victim's father testified that, after hearing the shots, he was looking for his son in the dark when the following occurred:
 "On my way to him, I asked him had he been shot and he said, `yes.' As I run up to him I asked him how bad it was, and he said, `It's bad.' I said, `where are you shot? and he said, `All over.'
. . . .
 "I asked him could he move his legs and he said, `no.' I asked him had he been shot in the back and he said, `yes.' I asked him who shot him, and he said, `John Hopkins.' I asked him, `how many times did he shoot ya'll? and he said, `four times.' I asked him where was he at, and he said, `at the corner of the garden.'"
Appellant argues that the decedent's statements were hearsay, were not a part of the res gestae, and could not be deemed spontaneous declarations since they were in response to questions. The same arguments were advanced and decided adversely to the defendants in Williams v. State, 291 Ala. 213,279 So.2d 478 (1973), and Smoot v. State, 381 So.2d 668
(Ala.Cr.App. 1980).
In Williams, as the victim lay mortally wounded in the driveway, a neighbor asked, "who done it?" and the victim replied, "Eunice done it." Our Supreme Court held the reply admissible as part of the res gestae. Similarly, in Smoot, two witnesses who reached the prostrate victim lying in a field and inquired what had happened were allowed to testify that the decedent said, "The Smoot boy did this to me." This court determined that the victim's statement was admissible as part of the res gestae. See also Nelson v. State, 130 Ala. 83,30 So. 728 (1901), and Davis v. State, 51 Ala. App. 200,283 So.2d 650 (1973), holding that similar statements are part of the res gestae if they are "instinctive and spontaneous" rather than "deliberative and retrospective." Davis v. State,51 Ala. App. at 202, 283 So.2d at 652.
The responses of the decedent in the case before us qualify, under the test set out in Nelson v. State, supra, as "the spontaneous givings out of a mind in the thrall and shadow of the mortal assault, . . . and [were] not a mere narration of a past transaction." 130 Ala. at 88, 30 So.2d at 730.
 VI
At trial, appellant objected to the introduction of seven photographs depicting wounds on the bodies of the two victims. He claims that the pictures were inflammatory, gruesome, had no probative value (or their probative value was outweighed by their prejudicial effect), and were cumulative. Five of the photographs were taken by a Jackson police officer shortly after the bodies were taken to the funeral home. Two of the photographs were made by the forensic pathologist who performed the autopsy.
Photographs are admissible in evidence if they have "some tendency to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, to corroborate or disprove some other evidence offered or to be offered." Baldwin v. State, 282 Ala. 653, 655,213 So.2d 819, 820 (1968). In addition, photographic exhibits are admissible even though they may be cumulative, demonstrative of undisputed facts, Craft v. State,402 So.2d 1135 (Ala.Cr.App. 1981), or gruesome, McKee v. State,33 Ala. App. 171, 31 So.2d 656 (1947). So long as the exhibits tend to shed light on the issues being tried, their admission is within the sound discretion of the trial judge. Thornton v.State, 369 So.2d 63 (Ala.Cr.App. 1979).
The photographs introduced here revealed the location and angle of the gunshot wounds as well as the presence of powder burns on the bodies of the victims, both factors highly relevant to the issue of self-defense. There was no error in their admission.
 VII
The decision of the Alabama Supreme Court in Beck v. State,396 So.2d 645 (1980), ruling that lesser included offenses must be considered in a death penalty case is not an unconstitutional violation of the *Page 1158 
separation of powers doctrine. Edwards v. State, [Ms. 1 Div. 335, June 29, 1982] (Ala.Cr.App. 1982); Magwood v. State,426 So.2d 918 (Ala.Cr.App. 1982); Raines v. State, [1982]429 So.2d 1104 (Ala.Cr.App. 1982); Clisby v. State, [Ms. 6 Div. 576, March 2, 1982] (Ala.Cr.App. 1982).
 VIII
Appellant argues that his motion for new trial should have been granted because the jury's verdict was contrary to the weight of the evidence on the issues of insanity and self-defense.
The standards for determining whether a defendant has met the burden of sustaining an insanity defense are outlined inHerbert v. State, 357 So.2d 683, 688 (Ala.Cr.App.), cert. denied, 357 So.2d 690 (Ala. 1978), and Christian v. State,351 So.2d 623, 624 (Ala. 1977), as follows:
 "1. By statute, there is a presumption of sanity extending to all persons over the age of 14.
 "2. The defense of insanity is an affirmative defense. The burden of proving this defense rests upon the defendant and never shifts to the State.
 "3. The burden upon the defendant is to establish the issue of legal insanity by a preponderance of the evidence and the reasonable satisfaction of the jury.
 "4. The question of insanity at the time of the commission of the crime is a matter to be determined by the jury from a consideration of all the evidence.
 "5. In making its determination, the jury may reject all expert testimony though it is without conflict.
 "6. However, opinion testimony, even of experts must be weighed by the jury and may not be arbitrarily ignored."
From a consideration of all the testimony in this case, it is our judgment that the evidence of insanity was neither overwhelming nor conclusive. From appellant's own testimony, there was evidence before the jury, aside from the mere presumption of sanity, that warranted a finding that appellant was sane.
For example, appellant's statement that he had no reason to expect a shoot-out on the evening of April 8 belied the psychiatrist's testimony that appellant's paranoia would lead him to believe he was threatened. Similarly, appellant's testimony that he called out to the figures to halt, discard their weapons, and undress to reveal any concealed weapons appeared to contradict Dr. Jordan's statement that appellant's mental disorder would cause him to behave impulsively. Appellant's stated reaction to the approach of the two figures in the dark appears entirely rational rather than impulsive. Finally, appellant was calm, "coherent and . . . normal" when he was arrested, see Cunningham v. State, 426 So.2d 484
(Ala.Crim.App. 1982).
Further, the jury was entitled to weigh Dr. Jordan's opinion that appellant was insane in light of the fact that his examination was made so long after the crime, Farley v. State,34 Ala. App. 54, 37 So.2d 434, cert. denied, 251 Ala. 391,37 So.2d 440 (1948), so close to trial, and for so short a time period. "The opportunity for study and observation of the person whose sanity is questioned are important factors the jury should consider in evaluating the weight to be accorded an expert's opinion." Cunningham v. State, supra.
The jury also had before it evidence that appellant had been determined to be sane by the staff of Searcy Hospital within three months of the shootings, and appellant's own expert did not question that finding. Finally, the jury was authorized to consider the fact that there was no evidence of prior mental illness from which appellant had suffered. Cf. Christian v.State, supra; Herbert v. State, supra.
In our judgment, therefore, the jury had "ample facts from which to draw an inference that the accused was in fact sane" in spite of expert testimony to the contrary. Bullard v. State,408 So.2d 164, 167 (Ala.Cr.App.), cert. denied, 408 So.2d 167
(Ala. 1982).
We also believe the verdict of the jury was fully warranted when viewed in *Page 1159 
light of the evidence — or lack of evidence — on the issue of self-defense. Although appellant's testimony, if believed, tended to show self-defense, the jury was justified in concluding that several of the elements of self-defense were lacking. See Burnett v. State, 380 So.2d 1021, 1022
(Ala.Cr.App. 1980).
Even though loaded guns belonging to both victims were found at the scene, testimony of the forensic expert showed that neither weapon had been fired, thereby contradicting appellant's claim that he heard a shot before he began firing. Similarly, the fact that both victims were shot in the back and at close range negates appellant's contentions that he acted in self-defense or fired blindly from a distance of twenty feet.
Finally, both victims were authorized to be on the property where the shooting occurred, while appellant, as an armed trespasser, was not entirely free from fault in initiating the difficulty. See Mack v. State, 348 So.2d 524, 527 (Ala.Cr.App. 1977).
We have examined the issues raised on appeal and have found no error. The judgment of conviction by the Clarke Circuit Court is hereby affirmed.
AFFIRMED.
All the Judges concurred.