The appellant, Danial L. Siebert, was convicted of the murders of Sherri Weathers, Chad Charles Weathers, and Joseph Charlton Weathers, a capital offense as defined by §13A-5-40(a)(10), Code of Alabama 1975. Following a sentencing hearing, the jury unanimously recommended a sentence of death. The trial court ordered a presentence investigation to be conducted and, after complying with § 13A-5-47, Code of Alabama
1975, sentenced the appellant to death by electrocution.
The evidence as presented by the State tended to establish that in late December 1985, Donald Hendron left Los Angeles, California, driving east. Hendron was going first to North Carolina to visit his family, and then to Talladega, Alabama, where he was to operate a theater program at the Alabama Institute for the Deaf and Blind (hereinafter referred to as the Institute). In Tucson, Arizona, Hendron picked up a man who identified himself as Danial Spence. Hendron identified the appellant as that man. Appellant, who was an artist, discussed his views on art with Hendron and showed him some of his work. Hendron was impressed with appellant's talent and asked him to come to Talladega and work with the theater program as a set designer. Appellant readily agreed, but stated that he wished to visit his mother in Illinois before going to Talladega. Hendron and appellant parted company just north of Jackson, Mississippi. Appellant was hitchhiking north to Illinois. Hendron continued driving east to North Carolina. Hendron arrived in Talladega on January 9, 1986. Appellant arrived there on January 20, 1986.
Hendron and appellant first shared an apartment at the Institute, then moved into another apartment in the Porter Building approximately a week and a half later. Appellant expressed to Hendron an interest in settling down in Talladega. Shortly after the two men moved into the Porter Building, appellant began dating Sherri Weathers, a 24-year-old deaf student at the Institute. Because such a relationship was specifically prohibited by the Institute's rules, Hendron wished to separate himself from this situation, and moved out of the Porter Building apartment on February 16, 1986. Hendron and appellant saw each other for the last time on February 19, 1986, when Hendron arranged to pick up appellant around 8:00 a.m. the next morning to attend a faculty meeting. When Hendron went by the Porter Building the next morning, however, appellant was not there.
In February 1986, Sherri Weathers was living in apartment 30 of the Sunrise Apartments with her sons, five-year-old *Page 774 
Chad and four-year-old Joey. Around 8:00 p.m. on February 19, 1989, appellant was seen with Sherri Weathers and a neighbor of hers, Linda Jarman, buying beer at a convenience store in Talladega. The three left the convenience store together. Fettus Porter, a neighbor of Sherri's, returned home around 9:30 p.m. that night and found a note from Sherri asking him to come over and play cards with her, Linda Jarman, and appellant. Porter went over to Sherri's apartment around 10:30 p.m., where he found Sherri and Linda chatting. They told Porter that appellant had left in Linda's car, a cream-colored Buick, to get some beer, and said they all were going to play cards when appellant returned. Porter remained at the apartment until about 11:30 or midnight. When he left to go back to his apartment, appellant still had not returned.
Sometime during the night of February 19, 1986, Catherine Elaine Shellborne, who lived next door to Sherri Weathers in apartment 31 of the Sunrise apartments, heard through her wall adjoining Sherri's apartment a man saying "Come to me. You can join your mother." Later, she heard the man say, "Come on and you will be with your mother and your brother."
Billy Kyle, another resident of the Sunrise Apartments, saw Sherri Weathers fighting with appellant in her apartment on the night of February 19, 1986. When asked what time he observed them fighting, Billy, a mildly retarded deaf man, could only say that it was sometime after 8:00 p.m., the time he arrived home. By Sunday, February 23, 1986, Billy had not seen Sherri or her children around the apartments. Remembering the fight he had seen between Sherri and appellant in her apartment on Wednesday night, Billy tried to check on Sherri, but could summon no one to the door of apartment 30. By this time Billy was extremely concerned about the welfare of Sherri and her children, so he entered Sherri's apartment through an unsecured window, but when he saw a part of Sherri's body protruding out from under a sheet, he became scared and left. Billy Kyle was later cleared by the police of any involvement in the murders.
The next morning, however, Billy told Wanda Hunley, an Institute social worker, that he was concerned about Sherri and asked her to check on Sherri and her sons. After making several phone calls, she learned that no one had seen Sherri or her children in several days. She also learned that there was an odor emanating from apartment 30. Ms. Hunley, accompanied by several other individuals, then went to the Sunrise Apartments and obtained a passkey for apartment 30. Upon entering the apartment, Ms. Hunley and the others found the bodies of Sherri, Chad, and Joey Weathers.
Autopsies of the bodies of the three people disclosed that Sherri Weathers died as the result of strangulation, and that Chad and Joey Weathers died as the result of ligature strangulation.
An extensive investigation was launched. During this investigation, shoe prints were lifted from apartment 30 and from the appellant's apartment in the Porter Building. The shoe print from the Porter Building apartment and some of those from Sherri's apartment were found to be consistent in tread design and approximate size. Additionally, a child's pajama bottom was found in appellant's Porter Building apartment.
In March 1986, a 1973 Buick was found abandoned near Elizabethtown, Kentucky. A black purse in this car contained a receipt bearing the name of Sherri Weathers. Also found in the car was a brass key which opened the door to appellant's Porter Building apartment. At an abandoned campsite near the Buick were found business cards bearing the name Danial Spence and the address of his Porter Building apartment; various photographs of Sherri Weathers; a mailgram addressed to Don Hendron; a birth certificate bearing the name Danny Ray Spence; other items bearing the name Danial Spence; two sheets of white paper on which appeared the names Sherri Weathers, Chad Weathers, and Joseph Weathers; and an art pad bearing the name Sherri Weathers. Various items of clothing found at the Kentucky site were *Page 775 
found to contain fibers of the same type as the red carpet in appellant's Porter Building apartment. Finally, two fingerprints and a palm print discovered on the Buick were identified as those of the appellant, Danial L. Siebert.
In March 10, 1986, appellant identified himself in New Jersey to Harold Hutchins of the Atlantic City Police Department, using a Social Security card bearing the name of Chad Weathers.
On June 14, 1986, appellant identified himself in Virginia to Joseph McLaughlin of the New Kent County Sheriff's Department, using a Social Security card bearing the name of Joseph Charles Weathers.
Appellant was finally apprehended in Hurricane Mills, Tennessee, on September 5, 1986. At the time of his arrest, appellant had in his possession a Social Security card bearing the name of Joseph C. Weathers, and a torn manila envelope on which appeared the following: "-eathers, Joseph."
After appellant was advised of his Miranda rights and waived those rights, he made a statement, the pertinent part of which follows:
He went to Sherri Weathers's apartment on the evening of February 19, 1986, and let himself in with a key which he had been given. Sherri and Linda Jarman were there. Eventually, Linda left. As he and Sherri were walking toward her bedroom, he strangled her with a piece of cloth that he had on his person. Then he woke up each of the boys individually and strangled them. He left town in a car, which he abandoned in Kentucky after it had two flat tires. After spending a couple of days at a campsite he set up near the car, he headed north and then went east, in an attempt to get as far away from Alabama as he could.
Thereafter, appellant waived his right to formal extradition proceedings and was returned to Alabama to stand trial for the murders of Sherri, Chad, and Joey Weathers. We note that appellant has also been convicted of the capital murder of Linda Jarman and received the death sentence. His conviction and sentence have been affirmed by this court. Siebert v. State
[Ms. 7 Div. 851, April 14, 1989] (Ala.Cr.App. 1989).
 I
Appellant first contends that the trial court erred in admitting into evidence statements made by appellant because, he says, the Miranda warnings given to him in Tennessee were improperly worded. Specifically, appellant contends that the detective, who informed appellant of his Miranda rights prior to appellant's making his statement, told him "anything you say can be used against you in court," instead of "anything you say can and will be used against you in a court of law," and therefore that his initial statement, and all subsequent statements, were inadmissible. This contention was raised without success in appellant's earlier appeal. Siebert v.State, supra.
Our examination of the record reveals that at the time of his arrest appellant was informed of his Miranda rights by Captain Hurst of the Talladega Police Department. Shortly thereafter, upon arrival at the Humphreys County, Tennessee, jail, appellant was again informed of his Miranda rights and made a decision to waive those rights. It was at this time that he was informed "anything you say can be used against you in court." Appellant then made an incriminating statement to Captain Hurst. Later, upon appellant's return to Talladega, he made another incriminating statement to Captain Hurst. However, prior to this statement, appellant was informed that "anything you say can and will be used against you in a court of law."
Appellant's contention that the wording differences between these two Miranda forms renders his confession inadmissible must fail. The opinion in Miranda v. Arizona, 384 U.S. 436,444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), states in pertinent part, that "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." This language was expounded upon *Page 776 
in California v. Prysock, 453 U.S. 355, 359-60, 101 S.Ct. 2806,2809-10, 69 L.Ed.2d 696 (1981), wherein the United States Supreme Court wrote as follows:
 "This Court has never indicated that the 'rigidity' of Miranda extends to the precise formulation of the warnings given a criminal defendant. See, e.g., United States v. Lamia, 429 F.2d 373, 375-376 (CA2), cert. denied, 400 U.S. 907
[91 S.Ct. 150, 27 L.Ed.2d 146] (1970). This Court and others have stressed as one virtue of Miranda
the fact that the giving of the warnings obviates the need for a case-by-case inquiry into the actual voluntariness of the admissions of the accused. See Fare v. Michael C., 442 U.S. [707], at 718 [99 S.Ct. 2560, 2568, 61 L.Ed.2d 197 (1979)]; Harryman v. Estelle, supra [616 F.2d 870 (5th Cir. 1980)]. Nothing in these observations suggests any desirable rigidity in the form of the required warnings.
 "Quite the contrary, Miranda itself indicated that no talismanic incantation was required to satisfy its strictures. The Court in that case stated that '[t]he warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant.' 384 U.S., at 476
[86 S.Ct., at 1629] (emphasis supplied). See also id., at 479 [86 S.Ct., at 1630] Just last Term in considering when Miranda applied we noted that that decision announced procedural safeguards including 'the now familiar Miranda warnings . . . or their equivalent.' Rhode Island v. Innis, 446 U.S. 291, 297 [100 S.Ct. 1682, 1688, 64 L.Ed.2d 297] (1980) (emphasis supplied)."
The language set out above was followed by this court inJones v. State, 456 So.2d 366, 373 (Ala.Cr.App. 1983), aff'd,456 So.2d 380 (Ala. 1984), cert. denied, 470 U.S. 1062,105 S.Ct. 1779, 84 L.Ed.2d 838 (1985), wherein we stated:
 "The Miranda decision requires no talismanic formulation of the warnings to be given to a criminal defendant as to the constitutional rights protected by that decision, California v. Prysock, 453 U.S. 355, 101 S.Ct. 2806, 69 L.Ed.2d 696
(1981). Reviewing the language used to inform the appellant herein of his right to appointed counsel, we find, as did the court in Prysock, supra, that '[t]his is not a case in which the defendant was not informed of his right to the presence of an attorney during questioning . . . or in which the offer of an appointed attorney was associated with a future time in court. . . .' Prysock, supra, at 361, 101 S.Ct. at 2810. (Citations omitted.) There was no error in this regard."
See also Siebert v. State, supra. We find, therefore, that the warning here sufficiently communicated to the appellant the necessary information regarding his constitutional rights.
The appellant also argues that his statements should not have been allowed into evidence because, he says, they were involuntary; specifically, he says they were conditioned on Captain Hurst's alleged promise that he would not be asked certain questions concerning "details" of the murders. Captain Hurst, however, testified that appellant told him that he would admit to the killings, but would not go into any details until he got back to Alabama, a condition to which Captain Hurst agreed. Appellant now claims that Captain Hurst's agreement to this condition constituted a "promise" or inducement for his statement, thereby rendering his statements involuntary and inadmissible.
The question of undue influence in obtaining admissions or confessions is determined by an examination of all attendant circumstances, with the inquiry focusing on whether the accused's free will and rational intellect were overborne at the time of his confession. Hubbard v. State, 500 So.2d 1204,1220 (Ala.Cr.App.), aff'd, 500 So.2d 1231 (Ala. 1986), cert.denied, 480 U.S. 940, 107 S.Ct. 1591, 94 L.Ed.2d 780 (1987);McCammon v. State, 499 So.2d 811, 815 (Ala.Cr.App. 1986);Seawright v. State, 479 So.2d 1362, 1367 (Ala.Cr.App. 1985);Agee v. State, 465 So.2d 1196, 1198 (Ala.Cr.App. 1984). "The factual inquiry centers on (1) the conduct of law enforcement officials in creating pressure and (2) the suspect's capacity *Page 777 
to resist that pressure." Seventeenth Annual Review of CriminalProcedure, 76 Geo.L.J. 676 (1988). "If an individual's 'will was overborne' or if his confession was not 'the product of a rational intellect and a free will,' his confession is inadmissible because coerced." Townsend v. Sain, 372 U.S. 293,307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1963). "The types of promises which may make a defendant's statement involuntary are, e.g., promises of leniency, promises to bring the defendant's cooperation to the attention of the prosecutor, the disclosure of incriminating evidence to the accused, and silence in response to the defendant's offer to talk if his statement would not be used against him." Siebert v. State,supra. However, this court has made it clear that a statement "is not rendered involuntary by a promise of benefit that was solicited freely and voluntarily by the defendant himself."Rowe v. State, 421 So.2d 1352, 1355 (Ala.Cr.App. 1982); Eakesv. State, 387 So.2d 855, 860 (Ala.Cr.App. 1978).
Although appellant has attempted to transform Captain Hurst's actions into a promise of benefit or inducement, it is readily apparent from the testimony that this was simply a condition placed by the defendant on the extent of his confession at that time. Captain Hurst neither promised appellant anything nor induced him in any way. He was merely acknowledging the terms which the appellant had unilaterally imposed. Appellant had the right to remain silent. He also had a right to limit any statement which he close to make. Captain Hurst was only honoring this right. Any benefit which may have accrued from this agreement was solicited freely and voluntarily by the appellant himself, and thus, failed to render his confession involuntary. Accordingly, the trial court correctly received the offered portions of appellant's confession into evidence.
 II
Appellant next contends that the trial court erred in refusing to invalidate his return from Tennessee to Alabama. Specifically, appellant contends that he did not understand that he had a right to contest his extradition at a hearing, and that he had the right to advice of counsel before and during such a hearing. Appellant is apparently arguing that because his return to Alabama was improper and therefore that this State's prosecution of him for the murders of Sherri, Chad, and Joey Weathers is illegal.
Even if appellant is correct in his statement of the underlying facts, his argument based on those fact is factually contrary to the United States Supreme Court's decision inFrisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541
(1952). There, a defendant was forcibly seized from his Chicago, Illinois, home by Michigan officers, handcuffed, beaten, and then taken to Michigan, where he was tried and convicted. As stated by Justice Black in Frisbie:
 "This Court has never departed from the rule announced in Ker v. Illinois, 119 U.S. 436, 444
[7 S.Ct. 225, 229, 30 L.Ed. 421 (1886)], that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.' No persuasive reasons are now presented to justify overruling this line of cases. They rest on the sound basis that due process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will."
342 U.S. at 522, 72 S.Ct. at 511. Thus, appellant has no complaint against the circumstances of his removal to Alabama, regardless of the facts.
Moreover, appellant's contentions concerning the circumstances surrounding his waiver of an extradition hearing in Tennessee are contrary to the evidence adduced at trial. Appellant was informed that he was entitled to a hearing in Tennessee to determine *Page 778 
whether he should be returned to Alabama, that he had a right to an attorney at this hearing, and that an attorney would be appointed for him if he was unable to afford one. Appellant stated that he understood these rights, that he did not want an attorney, and that he wanted to be extradited to Alabama. He also signed a form waiving his rights to a hearing or an attorney. Based on the foregoing, we fail to find any infringement of appellant's rights in the procedure followed relative to his removal from Tennessee to this State shortly after his apprehension. See Beecher v. State, 288 Ala. 1,256 So.2d 154, 164 (1971), rev'd on other grounds, 408 U.S. 234,92 S.Ct. 2282, 33 L.Ed.2d 317 (1972).
 III
Appellant further contends that the trial court erred in allowing the district attorney to introduce into evidence at the sentence hearing a minute entry regarding his prior capital murder conviction in Talladega for the robbery/murder of Linda Jarman. Appellant argues that consideration of this conviction was barred because it was committed at the same time as the present offense. Our Supreme Court has held, however, that a felony conviction may be considered for the purpose of establishing as an aggravating circumstance that the accused had previously been convicted of a capital felony or one involving the use or threat of violence to the person, even ifthe felony was committed after the present crime. Ex parteThomas, 460 So.2d 216, 225 (Ala. 1984); Ex parte Coulter,438 So.2d 352, 353 (Ala. 1983). (Emphasis supplied.) Therefore, appellant's contention of error must fail.
 IV
Appellant also contends that the trial court erred in receiving into evidence a videotape of the crime scene. He apparently contends that, because the State was allowed to introduce numerous photographs of the crime scene, introduction of the videotape was cumulative of these photographs. Appellant also argues that the videotape was highly prejudicial, and that at the very least, certain of the more grisly portions should have been excluded. The trial court initially agreed that the videotape had little probative value, but later decided to admit it into evidence.
This issue was also raised in appellant's earlier appeal. Judge McMillan, writing for this court in a case involving a related victim, stated as follows:
 "We find that the videotape was properly admitted into evidence. Captain Hurst testified that he made the video of the interior of the apartment and he stated that, after viewing the videotape, he concluded that it accurately and fairly depicted the interior of the victim's apartment as it appeared on February 24, 1986. Further, there is a date and time of filming on the videotape.
 " 'Provided that a proper foundation is laid, the admissibility of videotaped evidence in a criminal trial is matter within the sound discretion of the trial judge. Annot., 60 A.L.R.3d 333 (1974). See Thompson v. State, 462 So.2d 777, 779-80 (Ala.Cr.App. 1984). The State established the proper foundation here, and there is no question regarding the authenticity of the videotape. The fact that the tape was cumulative to other photographic evidence is not a basis for reversal. Photographic evidence is admissible even though it may be cumulative or demonstrative of undisputed facts. Hopkins v. State, 429 So.2d 1146, 1157 (Ala.Cr.App. 1983).'
 "Donahoo v. State, 505 So.2d 1067, 1071
(Ala.Cr.App. 1986).
 "Furthermore, the videotape was admissible despite the appellant's claim that it was highly inflammatory because as it showed the decomposition of the victim's body. The same rule applies for videotapes as for photographs: 'The fact that a photograph is gruesome and ghastly is no reason for excluding it, if relevant, even if the photograph may tend to inflame the jury. Ex parte Carpenter, 400 So.2d 427 (Ala. 1981).' Walker v. State, 416 So.2d 1083, 1090 (Ala.Cr.App. 1982). See also White v. State, 435 So.2d 1367, 1371 (Ala.Cr.App. 1983). *Page 779 
 " 'These photographs did have "some tendency to prove or disprove some disputed or material issue" or "to illustrate or elucidate some other relevant fact or evidence, or corroborate or disprove some other evidence offered of to be offered." Baldwin v. State, 282 Ala. 653, 655, 213 So.2d 819, 820 (1968). There is irony in a convicted murderer's contending on appeal that pictures of the corpse of his victim might have inflamed the jury. That risk "comes with the territory." '
 Grice v. State, 527 So.2d 784, 787 (Ala.Cr.App. 1988).
 " 'Further, the receipt into evidence of such exhibits lies within the sound discretion of the trial court. Hopkins v. State, 429 So.2d 1146
(Ala.Cr.App. 1983).' Burton v. State, 521 So.2d 91, 92 (Ala.Cr.App. 1987). We find no abuse of discretion by the trial court in allowing the videotape into evidence."
Therefore, the trial court correctly received the videotape into evidence.
 V
As required by Beck v. State, 396 So.2d 645 (Ala. 1980), and § 13A-5-53, Code of Alabama 1975, we have reviewed this case for any error involving the defendant's conviction and the propriety of his death sentence.
The defendant Danial L. Siebert was indicted and convicted of an offense which is punishable by death. § 13A-5-40(a)(10),Code of Alabama 1975.
There has been no argument made by the defendant that the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, and there is no evidence to support any such contention.
Our review of the sentencing proceedings reveals that the trial court's findings concerning the aggravating and mitigating circumstances are supported by the evidence. The trial court found the existence of only one aggravating circumstance: that the defendant was previously convicted of two felonies involving the use or threat of violence to the person, to wit: voluntary manslaughter in which the defendant was sentenced to ten years' imprisonment, and capital murder for which the defendant was sentenced to death by electrocution. Section 13A-5-49(2), Code of Alabama 1975. After considering each of the statutory mitigating circumstances set out in § 13A-5-52, the trial court found the existence of no mitigating circumstances. As the trial court concluded, appellant "does not possess a single redeeming feature nor attribute." This finding was also supported by the evidence.
Our independent weighing of the aggravating and mitigating circumstances convinces this court of the propriety of the death sentence in this case.
Moreover, we are convinced that the death sentence is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.See Jones v. State, 520 So.2d 543 (Ala.Cr.App. 1984), aff'd,520 So.2d 553 (Ala.), cert. denied, ___ U.S. ___,109 S.Ct. 182, 102 L.Ed.2d 151 (1988) (murder of two or more persons);Peoples v. State, 510 So.2d 554 (Ala.Cr.App. 1986), aff'd,510 So.2d 574 (Ala. 1987), cert. denied, 484 U.S. 933,108 S.Ct. 307, 98 L.Ed.2d 266 (1987) (murder of two or more persons).
Finally, we have searched the entire record for any plain error or defect which might have adversely affected the defendant's substantial rights and have found none. Alabama Rules of Appellate Procedure, Rule 45A.
The appellant's conviction of this capital offense and his sentence of death are due to be, and they are hereby, affirmed.
AFFIRMED.
All the Judges concur. *Page 780